Blake S. Atkin (Idaho 6903)
ATKIN LAW OFFICES, PC
7579 N Westside Highway
Clifton, ID 83228
Office☏801) 533-0300
blake@atkinlawoffices.net

Brennan H. Moss (Utah 10267) (Pro Hac Vice pending)
Pia Anderson Moss Hoyt, LLC
136 E. South Temple, Suite 1900
Salt Lake City, Utah 84111
Office: (801) 350-9000
Facsimile: (801) 350-9010
Email: bmoss@pamhlaw.com

*Attorneys for Defendant KayLynn Dalebout*

## UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO
### Eastern Division

| | |
|---|---|
| Yellowstone Partners, LLC, | **NOTICE OF REMOVAL** |
| Plaintiff, | Case No. |
| v. | |
| KayLynn Dalebout, | |
| Defendant. | |

Pursuant to 29 U.S.C. § 1441, Defendant Kaylynn Dalebout ("***Dalebout***"), hereby gives this NOTICE OF REMOVAL of this action from the District Court of the State of Idaho for the County of Bonneville, Case No. CV-10-19-1674, to the United States District Court for the District of Idaho.

In accordance with 28 U.S.C. § 1446, Defendant Dalebout submits the following statement of the grounds for removal:

1.  This civil action was originally brought in the District Court of the Seventh Judicial District of the State of Idaho, County of Bonneville, Case No. CV-10-19-1674.

2.  The State Court in which this action was originally brought is located within the District of this Court.

3.  Copy of the Complaint and Demand for Jury Trial and Summons served on the Defendant in the State court proceeding and attached as Exhibit "A" to this NOTICE OF REMOVAL.

4.  Copy of the docket from the State court file proceeding is attached as Exhibit "B" to this NOTICE OF REMOVAL.

5.  Copy of the Plaintiff's Notice of Serving First Request For Discovery on Defendant Dalebout with Summons and Verified Complaint as Exhibit "C" to this NOTICE OF REMOVAL.

6.  Plaintiff's Notice of Service was served upon Defendant Dalebout in the state of Wyoming.

7.  This Court has original jurisdiction over this action under 28 U.S.C. § 1332 as follows:

    a.  Defendant Dalebout is a resident and citizen of the State of Wyoming. *See* Attached Declaration of Defendant Dalebout as Exhibit "D".

    b.  Plaintiff Yellowstone is a limited liability company with its principle place of business in Bonneville County, Idaho. *See* Complaint, ¶ 1.

c. The matter in controversy in this case exceeds $75,000.000. *See* Complaint, ¶¶ 20, 26, & 32.

8. The filing of the NOTICE OF REMOVAL is timely pursuant to 28 U.S.C. § 1446, because the filing was within 30 days of the day of service in the state case. Defendant was served on May 20, 2019.

9. Defendant has caused notice of this NOTICE OF REMOVAL to be served upon counsel for the Plaintiff and to be filed with the Clerk of the District Court of the Seventh Judicial District of the State of Idaho, County of Bonneville.

WHEREFORE, Defendant files this NOTICE OF REMOVAL removing the action now pending in the District Court of the Fourth Judicial District of the State of Idaho, County of Bonneville, Case No. CV-10-19-1674 from the State Court to this Court. Defendant respectfully request that this action proceed as an action properly removed hereto.

DATED this 20th day of June 2019.

ATKIN LAW OFFICES, PC

/s/ Blake S. Atkin
BLAKE S. ATKIN

PIA ANDERSON MOSS HOYT

/s/ Brennan H. Moss
BRENNAN H. MOSS

*Attorneys for KayLynn Dalebout*

Exhibit A

Tingey, Joel E.

Electronically Filed
3/19/2019 4:15 PM
Seventh Judicial District, Bonneville County
Penny Manning, Clerk of the Court
By: Melissa Huston, Deputy Clerk

MARK R. FULLER (ISB No. 2698)
DANIEL R. BECK (ISB No. 7237)
PAUL FULLER (ISB No. 8435)
FULLER & BECK LAW OFFICES, PLLC
410 MEMORIAL DRIVE, SUITE 201
P.O. BOX 50935
IDAHO FALLS, ID 83405-0935
TELEPHONE: (208) 524-5400
EMAIL: FULLERANDBECK@GMAIL.COM

ATTORNEYS FOR PLAINTIFF

# IN THE DISTRICT COURT OF THE SEVENTH JUDICIAL DISTRICT OF THE STATE OF IDAHO IN AND FOR THE COUNTY OF BONNEVILLE

| | |
|---|---|
| YELLOWSTONE PARTNERS, LLC, an Idaho limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>KAYLYNN DALEBOUT, a divorced woman,<br><br>Defendant. | Case No. CV10-19-1674<br><br>**VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff, YELLOWSTONE PARTNERS, LLC, by and through its attorneys, Fuller & Beck Law Offices, PLLC hereby complains of the defendant and alleges as follows:

## FACTS COMMON TO ALL CLAIMS

1. Plaintiff Yellowstone Partners, LLC, is a limited liability company with its principal place of business in Bonneville County, State of Idaho (hereafter "Yellowstone Partners").

2. Defendant KayLynn Dalebout, is an individual residing in Bonneville County, State

COMPLAINT – 1

of Idaho.

3. Dalebout was employed by Yellowstone Partners as Human Resources Director and as its Chief Financial Officer and a member of its Board of Directors from August, 2016 until September, 2017.

4. On April 17, 2017, Dalebout entered into a written Employment Agreement with Yellowstone Partners. A true and correct copy of such Employment Agreement is attached hereto as Exhibit 'A'.

5. Jurisdiction and Venue are proper in this Court as Defendant Dalebout agreed to the terms of the Employment Agreement which provides for jurisdiction and venue in the State of Idaho. See Exhibit 'A', Section 8.6.

6. The Employment Agreement is governed by Idaho law, pursuant to Exhibit 'A', Section 8.6.

7. As part of her duties, Dalebout created an Employee Handbook and Accounting Policies and Procedures Manual for the purpose of preventing unauthorized financial withdrawals from the bank accounts of Yellowstone Partners. The Employee Handbook and Accounting Policies and Procedures Manual were approved by the Board of Directors of Yellowstone Partners, of which Dalebout was a member. A copy of the Employee Handbook is attached hereto as Exhibit 'B'. Dalebout acknowledged receipt of the Employee Handbook on October 11, 2016 and agreed that it was her responsibility to read and comply with the policies in the Handbook. See Exhibit 'C' attached hereto.

8. The Accounting Policies and Procedures Manual includes a policy that all checks drawn on Yellowstone Partners bank accounts in excess of $10,000 require

signature by the President and by one of the Board of Directors authorized to sign.

9.  In April, 2017 Dalebout gave herself a bonus of $6,187.50 without authorization.

10. In 2017, Dalebout attended a Certified Public Accountant conference in Las Vegas, Nevada, which was not for Yellowstone's benefit or at Yellowstone's direction. Dalebout reimbursed herself $4,989.79 for the CPA conference without approval from Yellowstone Partners and in violation of the Employee Handbook which Dalebout wrote for the company which expressly provides that "Authorization from Yellowstone Partners Management team must be granted prior to enrolling in classes" in order to qualify for reimbursement.

11. Dalebout took excessive and unauthorized vacation time in violation of the Employee Handbook and Yellowstone Partners' policy.

12. On July 13, 2017, Dalebout wrote herself a check, upon which she was the sole signatory, in violation of the Employee Handbook and Yellowstone Partners' policy, and withdrew $94,627.79 from Yellowstone Partners' account, despite knowing that Yellowstone Partners did not have sufficient funds to pay its debts to creditors.

## COUNT I

## CONVERSION-DALEBOUT

13. Plaintiff incorporates in this Count I each of the allegations contained in paragraphs 1 through 12 as set forth above.

14. Dalebout took a bonus of $6,187.50 without authorization of the Board of Yellowstone Partners, which was unearned at the time she took the bonus.

15. Dalebout wrote a check out to herself, without appropriate authorization, without obtaining two-signatures, and in violation of company policies in the amount of

$94,627.79, and misappropriated such funds to her own personal use and enjoyment.

16. Dalebout reimbursed herself for a Certified Public Accountant conference in Las Vegas, Nevada, during March, 2017, without authorization, and despite the fact that such conference was not for the benefit of Yellowstone Partners or at Yellowstone Partners' direction.

17. Dalebout gave herself excessive and unauthorized vacation time in violation of the Employee Handbook and Yellowstone policy in the amount of 30 days, which had a value equal to $11,455.00.

18. Plaintiff did not consent in any manner to Dalebout taking the funds at issue for her personal use.

19. Dalebout has not returned the funds to Yellowstone Partners, in spite of demands for repayment.

20. Plaintiff has been damaged in an amount to be proven at trial not less than $112,270.29 and interest accruing thereon at the rate of 12% per annum from July 13, 2017, as a result of Dalebout's actions in converting and misappropriating funds belonging to Yellowstone Partners.

21. That by reason of Defendants' conversion, Plaintiff has been required to obtain the services of an attorney, Mark R. Fuller of Fuller & Beck Law Offices, PLLC, in order to collect the same, and that pursuant to Idaho Code §12-120 Plaintiff is entitled to its reasonable costs and attorney's fees, and that a reasonable attorney fee should the above stated matter be uncontested is a sum in the amount of $2,500.00, plus filing fees and Plaintiff further requests such additional amount as may be

determined by the Court should this matter be contested, including post-judgment attorney fees pursuant to Idaho Code Section 12-120(5).

## COUNT II

## BREACH OF CONTRACT-DALEBOUT

22. Plaintiff incorporates in this Count II each of the allegations contained in paragraphs 1 through 21 as set forth above.

23. Dalebout contracted with Yellowstone Partners to act as its Chief Financial Officer.

24. Dalebout's duties as Chief Financial Officer included preparing and implementing fiscal policies to ensure that no one person had access or control over Yellowstone Partner's fund, ensuring that budgets, accountings, and reports of financial activities were timely and accurately updated, ensuring that the Board of Directors had access to the financial transactions and accounts of Yellowstone Partners, ensuring that payments and reimbursements were only made for authorized transactions, and ensuring that employees only received educational expense reimbursements and vacation days to which they were entitled.

25. Dalebout breached such duties by violating company policies in writing checks to herself with only her own signatureand convincing the Bank of Idaho to cash such check, by taking extra vacation days to which she was not entitled, by writing herself a bonus check for which she was not entitled by taking payment for vacation days to which she was not entitled, by failing to inform the Board or receive any approval for the financial actions she was taking to enrich herself at Yellowstone Partners' expense.

26. Dalebout's breach of her contract caused damages to Yellowstone Partners in the

amount greater than $100,000.00 or an amount to be proven at trial, and interest accruing thereon at the rate of 12% per annum from July 13, 2017.

27. That by reason of Defendants' breach of contract, Plaintiff has been required to obtain the services of an attorney, Mark R. Fuller of Fuller & Beck Law Offices, PLLC, in order to collect the same, and that pursuant to Idaho Code §12-120 Plaintiff is entitled to its reasonable costs and attorney's fees, and that a reasonable attorney fee should the above stated matter be uncontested is a sum in the amount of $2,500.00, plus filing fees and Plaintiff further requests such additional amount as may be determined by the Court should this matter be contested, including post-judgment attorney fees pursuant to Idaho Code Section 12-120(5).

## COUNT III

## BREACH OF FIDUCIARY DUTY-DALEBOUT

28. Plaintiff incorporates in this Count III each of the allegations contained in paragraphs 1 through 27 as set forth above.

29. Dalebout had fiduciary duties to Yellowstone Partners as a result of her employment as Yellowstone Partners' Chief Financial Officer and her position as a member of the Board of Directors, and as a result was duty bound to act with the utmost good faith for the benefit of Yellowstone Partners.

30. Dalebout violated such fiduciary duties by violating policies Dalebout herself put in place to protect the financial integrity of Yellowstone Partners including specific policies regarding vacation days available to employees, reimbursement of educational expenses, dual-signatures on checks, issuance of bonuses, and by converting and misappropriating Yellowstone Partners' funds for her own personal

use and enjoyment, in violation of company policy and at a time when Yellowstone Partners was in difficult financial circumstances.

31. Dalebout knew that Yellowstone Partners did not have sufficient funds to pay its creditors at the time she violated her fiduciary duties.

32. Dalebout caused damage to Yellowstone Partners in an amount to be proven at trial not less than $100,000.00, and interest accruing thereon at the rate of 12% per annum from July 13, 2017.

33. That by reason of Dalebout's breach of fiduciary duty, Plaintiff has been required to obtain the services of an attorney, Mark R. Fuller of Fuller & Beck Law Offices, PLLC, in order to collect the same, and that pursuant to Idaho Code §12-120 Plaintiff is entitled to its reasonable costs and attorney's fees, and that a reasonable attorney fee should the above stated matter be uncontested is a sum in the amount of $2,500.00, plus filing fees and Plaintiff further requests such additional amount as may be determined by the Court should this matter be contested, including post-judgment attorney fees pursuant to Idaho Code Section 12-120(5).

## PRAYER

WHEREFORE, plaintiffs pray for Judgment against the defendantsas follows:

1. For money judgment against Defendant Dalebout for her conversion and misappropriation of Yellowstone Partners' funds in the amount of $112,270.29, and interest accruing thereon at the rate of 12% per annum from July 13, 2017, or such amount as is proven at trial.

2. For money judgment against Defendant Dalebout for her breach of contract in the amount of $112,270.29, and interest accruing thereon at the rate of

12% per annum from July 13, 2017, or such amount as is proven at trial.

3.    For money judgment against Defendant Dalebout for her breach of fiduciary duty in the amount of $112,270.29, and interest accruing thereon at the rate of 12% per annum from July 13, 2017, or such amount as is proven at trial.

4.    For reasonable attorney's fees and costs incurred by Plaintiff. Such reasonable attorneys fees and costs shall be $2,500.00 if this matter is uncontested.

5.    For such other and further relief as the Court deems appropriate.

DATED this 19th day of March, 2019.


                                              FULLER & BECK LAW OFFICES, PLLC


                                              /s/ Mark R. Fuller
                                              Mark R. Fuller
                                              Attorney for Plaintiff

**VERIFICATION**

STATE OF IDAHO                    )
                                 )
COUNTY OF BONNEVILLE             )

Doyle Beck, being first duly sworn upon oath, deposes and says:

That he is the Manager of the Plaintiff, Yellowstone Partners, LLC, in the above entitled action; that he has read the above and foregoing COMPLAINT, knows the contents thereof, and that the same are true to the best of his knowledge.

                              /s/ Doyle Beck
                              Doyle Beck, Manager

SUBSCRIBED AND SWORN TO before me this 8th day of March, 2019.

(SEAL)                        /n/ Mark R. Fuller
                              Notary Public for Idaho
                              Residing at Idaho Falls, ID
                              Commission Expires: 06-09-2021

COMPLAINT - 9

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (the "Agreement"), dated as of April 9, 2017, is made and entered into by and between Yellowstone Partners, LLC, an Idaho limited liability company (the "Company"), and KayLynn Dalebout (the "Executive").

WHEREAS, the Company desires to employ Executive, and the Executive wishes to enter into the employ of the Company, on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the promises and the mutual covenants and agreement contained herein and intending to be bound hereby, the parties agree as follows:

1.      Duration of Agreement. This Agreement is effective on the date set forth above. Unless terminated or amended in writing by the parties, this Agreement will govern the Executive's continued employment by the Company until that employment ceases in accordance with Section 5 hereof.

2.      Position; Duties. The Executive will be employed as the Company's Chief Financial Officer, reporting directly to the Company's Chief Executive Officer (the "CEO"). In such position, the Executive shall perform such duties and shall have such authority consistent with such position as may be assigned to her from time to time by the CEO. The Executive shall devote her best efforts and all of her business time and services to the Company and its Affiliates. The Executive shall not, in any capacity, engage in other business activities or perform services for any other Person without the prior written consent of the Company; *provided, however,* that without such consent, the Executive may engage in charitable or public service, so long as such activities do not interfere or conflict with the Executive's performance of her duties and obligations hereunder.

3.      Place of Performance. The Executive will perform her services hereunder at the principal executive offices of the Company, or in other such place as will ensure the Executive can fully perform his duties to the Company; *provided, however,* that the Executive may be required to travel from time to time as necessary for business purposes.

4.      Compensation and Indemnification.

4.1.    Base Salary. The Executive's annual salary will be $125,000 (the "Base Salary"). The Company shall pay the Base Salary, less such withholdings and deductions as required by applicable law, to the Executive in accordance with the Company's usual payroll practices as in effect from time to time. The Base Salary shall be reviewed on an annual basis by the CEO and may be adjusted from time to time by the CEO.

4.2.    Annual Performance Bonus.

4.2.1.   For each fiscal year ending during her employment, the Executive will be eligible to earn an annual performance bonus for the applicable fiscal year. The actual performance bonus payable with respect to a particular year will be determined by the Board based on the achievement of previously agreed upon performance objectives, but in any event shall not be less than 15% of the Executive's base salary. Such bonus shall be paid to

2

EXHIBIT A

Executive in two installments – 1/3 of the bonus will be paid within 10 business days of the Executive's 6 month anniversary of employment and the remainder will be paid in a lump sum no later than the last day of the "applicable 2-1/2 month period," as such term is defined in Treasury Regulation Section 1.409A-1(b)(4)(i)(A) with respect to such payment's treatment as a "short-term deferral" for purposes of Section 409A.

    4.2.2.    All or any portion of the annual performance bonus may be paid to Executive in the form of issuing membership interests in the Company to Executive, as may be determined by the Board in its discretion.

    4.2.3.    For purposes of determining any bonus payable to Executive, the measurement of corporate and individual performance will be performed by the Board in good faith.

    4.3.    <u>Employee Benefits</u>. The Executive will be eligible to participate in the employee benefit plans, policies or arrangements maintained by the Company for its senior executive employees generally, subject to the terms and conditions of such plans, policies or arrangements; *provided, however*, that this Agreement will not limit the Company's ability to amend, modify or terminate such plans, policies or arrangements at any time for any reason.

    4.4.    <u>Paid Time Off</u>. Subject to the terms and conditions of the Company's policy, as may be amended from time to time, the Executive will be eligible for four (4) weeks of paid time off each calendar year.

    4.5.    <u>Reimbursement of Expenses</u>. The Company will pay or reimburse the Executive for all reasonable business expenses incurred or paid by the Executive in the performance of his duties and responsibilities for the Company in accordance with the business expense reimbursement policies of the Company, as may be amended from time to time, including the Executive's cell phone.

    4.6.    <u>Indemnification.</u> To the fullest extent permitted by law, the Company shall indemnify, defend and hold harmless the Executive from and against any and all debts, losses, claims, damages, costs, demands, fines, judgments, contracts, leases, penalties, obligations, payments, liabilities of every type and nature (whether known or unknown, fixed or contingent), including those arising out of any lawsuit, action of proceeding (whether brought by a party to this Agreement or by any third party), together with any reasonable costs and expenses (including reasonable attorneys' fees, out-of-pocket expenses and other reasonable costs and expenses incurred in investigating, preparing or defending any pending or threatened lawsuit, action or proceeding) incurred in connection with the foregoing suffered or sustained by the Executive by reason of any act, omission or alleged act or omission by the Executive arising out of the Executive's activities taken primarily on behalf of the Company, or at the request or approval of the Company, or primarily in furtherance of the interests of the Company; provided, however, that such acts, omissions or alleged acts or omissions upon which such actual or threatened actions, proceedings or claims are based were performed or omitted in good faith and were not fraudulent, in bad faith, a result of wanton and willful misconduct or gross negligence by the Executive. The Company shall advance expenses to the Executive to the fullest extent permitted by law.

3

5.      Termination; Severance. The Executive's employment hereunder shall terminate on the earliest of: (i) thirty (30) day written notice, with an opportunity to cure, from the Board to Executive for Cause (as defined below), (ii) on a date not less than 30 days following written notice from the Executive that she is resigning from the Company, (iii) on the date of her death, (iv) on the date of her Disability, or (v) the twenty fourth (24) month anniversary of this Agreement ("Term"), provided that this Agreement shall be reviewed for renewal renew for successive one (1) year periods (each a "Renewal Term") unless either Executive or The Company provides ninety (90) day prior written notice of its intent to not renew this Agreement. Upon cessation of her employment for any reason, unless otherwise consented to in writing by the Board, the Executive shall resign immediately from any and all officer, director, manager and other positions she then holds with the Company and/or its Affiliates. Upon any cessation of her employment with the Company, the Executive shall be entitled only to such compensation and benefits as described in this Section 5. Notwithstanding any other provision of this Agreement, it is the parties' intent that this Agreement and the Executive's employment shall survive the appointment of a receiver or a bankruptcy trustee with respect to the Company.

5.1.    Termination without Cause or Resignation for Good Reason. If the Executive's employment by the Company ceases due to a termination by the Company (or by virtue of the appointment of a receiver or bankruptcy trustee over the Company) without Cause (as defined below) or a resignation by the Executive for Good Reason (as defined below), the Company shall pay to the Executive:

5.1.1.      that portion of Base Salary that has accrued prior to the effectiveness of such termination and has not yet been paid according to the Company's usual payroll practices;

5.1.2.      an amount equal to the value of her accrued but unused vacation according to the Company's usual payroll practices;

5.1.3.      reimbursement for the business expenses set forth in Section 4.5 properly incurred by the Executive on behalf of the Company prior to such termination date in accordance with the Company's usual payroll practices;

5.1.4.      to the extent then unpaid, the annual bonus (if any) with respect to the calendar year ended immediately prior to the cessation of the Executive's employment, which bonus shall be paid in a lump sum no later than the last day of the "applicable 2-1/2 month period," as such term is defined in Treasury Regulation Section 1.409A-1(b)(4)(i)(A) with respect to such payment's treatment as a "short-term deferral" for purposes of Section 409A; and

5.1.5.      the greater of that portion of Base Salary due for the remainder of the Term or Renewal Term from the date of termination, or monthly severance payments equal to one-twelfth of the Executive's then current Base Salary for a period equal to three (3) months (the "Severance Period").

Except as otherwise provided in this Section 5.1, all compensation and benefits will cease at the time of the Executive's cessation of employment and the Company will have no further liability or obligation by reason of such cessation of employment. The payments and benefits described

in this Section 5.1 are in lieu of, and not in addition to, any other severance arrangement maintained by the Company. Notwithstanding any provision of this Agreement, the payments and benefits described in Section 5.1.5 are conditioned on: (a) the Executive's execution and delivery to the Company and the expiration of all applicable statutory revocation periods, by the 60th day following the effective date of his cessation of employment, of a general release of claims against the Company and its Affiliates substantially in the form attached hereto as Exhibit A (the "Release"); and (b) the Executive's continued compliance with the Restrictive Covenants (as defined below). Subject to Section 5.3 below, the benefits described in Section 5.1.5 will begin to be paid as soon as administratively practicable after the Release becomes irrevocable, provided that if the 60 day period described above begins in one taxable year and ends in a second taxable year such payments or benefits shall not commence until the second taxable year.

    5.2.   Other Terminations. If the Executive's employment with the Company ceases for any reason other than as described in Section 5.1 above (including but not limited to (a) termination by the Company for Cause, (b) resignation by the Executive without Good Reason, (c) termination as a result of the Executive's Disability, or (d) the Executive's death), then the Company's obligation to the Executive will be limited solely to the payments set forth in Sections 5.1.1 through 5.1.4. All compensation and benefits will cease at the time of such cessation of employment and, except as otherwise provided in any other agreement or by COBRA, the Company will have no further liability or obligation by reason of such termination. The foregoing will not be construed to limit the Executive's right to payment or reimbursement for claims incurred prior to the date of such termination under any insurance contract funding an employee benefit plan, policy or arrangement of the Company in accordance with the terms of such insurance contract.

    5.3.   Compliance with Section 409A. Notwithstanding anything to the contrary in this Agreement, no portion of the benefits or payments to be made under Section 5.1.4 through Section 5.1.5 hereof will be payable until the Executive has a "separation from service" from the Company within the meaning of Section 409A of the Code. In addition, to the extent compliance with the requirements of Treas. Reg. § 1.409A-3(i)(2) (or any successor provision) is necessary to avoid the application of an additional tax under Section 409A of the Code to payments due to the Executive upon or following his "separation from service", then notwithstanding any other provision of this Agreement (or any otherwise applicable plan, policy, agreement or arrangement), any such payments that are otherwise due within six months following the Executive's "separation from service" (taking into account the preceding sentence of this paragraph) will be deferred without interest and paid to the Executive in a lump sum immediately following such six month period. This paragraph should not be construed to prevent the application of Treas. Reg. § 1.409A-1(b)(9)(iii) (or any successor provision) to amounts payable hereunder. For purposes of the application of Section 409A of the Code, each payment in a series of payments will be deemed a separate payment.

    6.   Restrictive Covenants. The Executive acknowledges and agrees to abide by the terms of, and agrees that his employment by the Company is contingent upon his agreeing to abide by the restrictive covenants set forth in this Section 6 (the "Restrictive Covenants"). The Executive acknowledges that the Restrictive Covenants shall continue to remain in full-force and effect following the cessation of the Executive's employment with the Company for any reason; provided, however, that the covenants contained in Section 6.1 shall not apply to Executive

following the cessation of the Executive's employment with the Company if the Executive's employment is terminated without cause or by a receiver or bankruptcy trustee of the Company; *provided, further,* that such restrictive covenants may be modified by mutual agreement between the parties hereto; *and provided* that any restrictive covenant herein which is rendered incompatible with federal, state or local law shall be rendered effective only to the extent allowed by such law.

6.1.    Covenant Not to Compete; Solicit Employees or Clients. Executive acknowledges that maintaining existing clients and employees is vital to the Company's continued success and that the duties Executive will perform as an employee are of special and unique value to the Company in this respect. Executive shall not, during the term of this Agreement and for a period of two (2) years following the date of Executive's termination of employment for any reason, do or undertake any of the following activities in the States of Idaho, Utah, Montana, and Wyoming as well as the City of Tucson:

6.1.1.    directly or indirectly, alone or in concert with others, market, furnish, support, maintain, or engage in any business providing investment advisory services or similar services based in the States of Idaho, Utah, Montana, and Wyoming as well as the City of Tucson;

6.1.2.    directly or indirectly, alone or in concert with others, solicit or accept business from any "Client" as that term is defined below or "Lead" as that term is defined below or take any other action with respect to any Client or Lead adverse to the Company's business interests. The term "Client" shall mean any person or entity who has transacted business with the Company or any of its Affiliates within two (2) years prior to the date of termination of Executive's employment with the Company. The term "Lead" shall mean any prospective Client targeted by the Company, whether targeted by or contacted by the Executive or any other of the Company's personnel. This includes any lists of prospective Clients provided to Executive by the Company;

6.1.3.    directly or indirectly, alone or in concert with others, solicit or accept business or provide services to any supplier or competitor of the Company with its principal place of business located in the States of Idaho, Utah, Montana, and Wyoming as well as the City of Tucson; or

6.1.4.    hire, solicit, divert or induce any employee of the Company to leave the employment of the Company.

6.2.    Confidential Information. Executive hereby agrees not to disclose to any person, other than to an employee of the Company or its subsidiaries (or customers or others in furtherance of the Company's business interests) with the consent of the Company, and other than as required by law, any specialized knowledge that he has developed while associated with the Company, or will develop while associated with the Company or any successor with respect to the Company's business, including without limitation trade secrets or confidential information with respect to any of the Company's trademarks, licenses, products and lines of business, markets, key personnel, financial information, cost of providing services and products, profitability, services, systems, processes, data, code, customers and business relationships,

methods of operation and marketing, and training, policies and banking relationships and processes (collectively, the "Confidential Information"); provided, however, that the Confidential Information shall not include any information known generally to the public (other than as a result of an unauthorized disclosure) or any general knowledge developed by Executive prior to Executive's employment by the Company.

6.3.    Surrender of Documents.  Executive agrees that immediately upon termination of her employment with the Company, or at any other time upon the Company's request, she will surrender to the Company, in good condition, any and all records, books, documents or files and all copies thereof kept by her containing the names, addresses, and any and all other information or data with regard to the Company's work processes, formulas, systems, data, code, clients or potential clients of the Company served by Executive or any other person.

6.4.    Remedies.  Executive acknowledges that (i) it would be unfair to engage in competition or solicitation that diminishes the value of the Company, its subsidiaries or the Company's business, (ii) that it would be difficult to measure damage to the Company or its subsidiaries from any breach by Executive of the promises set forth in this Section 6, (iii) that injury to the Company or its subsidiaries from any such breach would be impossible to calculate, and (iv) that money damages would therefore be an inadequate remedy for any such breach. Accordingly, Executive agrees that if she breaches any provision of this Section 6, the Company and its Affiliates shall be entitled, in addition to all other remedies they may have, to injunctions or other appropriate orders to restrain any such breach by Executive without showing or proving any actual damage sustained by the Company or its subsidiaries, and Executive agrees to waive any requirement for the securing or the posting of any bond in connection with such relief.

6.5.    Severability.  The parties hereby acknowledge and agree that this Agreement (including without limitation the restrictions against solicitation and disclosure of information set forth in this Section 6) is reasonable and valid.  However, if any such restriction is found by any court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities or in too broad a geographic area, it shall be interpreted (but only with respect to such jurisdiction) to extend only over the maximum period of time, range of activities or geographic area as to which it may be enforceable in such jurisdiction.  The invalidity or unenforceability of any provisions of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement.

7.    Certain Definitions.  For purposes of this Agreement:

7.1.    "Affiliate" means, with respect to any specified Person, any other Person that directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such specified Person, provided that, in any event, any business in which the Company has any direct ownership interest shall be treated as an Affiliate of the Company.

7.2.    "Cause" means (i) Executive being convicted of, or entering a plea of nolo contendere to, a felony, (ii) Executive committing any act of moral turpitude, dishonesty or fraud against the Company or its Affiliates, (iii) Executive engaging in knowing and intentional illegal

conduct that was or is materially injurious to the Company or its Affiliates, (iv) Executive's repeated failure to substantially perform his employment duties assigned hereunder after written notice from the Board describing in reasonable detail Executive's failure to perform such duties and the basis for the Board's belief that Executive has not substantially performed such duties, (v) Executive's breaching, in any material respect, the terms of this Agreement, or (vi) any regulatory, federal, state or local governing authority or agency imposing any censure, bar or suspension against Executive's professional licenses.

7.3.   "Code" means the Internal Revenue Code of 1986, as amended.

7.4.   "Control" (including, with correlative meanings, the terms "Controlled by" and "under common Control with"), as used with respect to any Person, means the direct or indirect possession of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

7.5.   "Disability" means a condition entitling the Executive to benefits under the Company's long term disability plan, policy or arrangement; *provided, however*, that if no such plan, policy or arrangement is then maintained by the Company and applicable to the Executive, "Disability" will mean the Executive's inability to perform his duties under this Agreement due to a mental or physical condition (other than alcohol or substance abuse) that can be expected to result in death or that can be expected to last (or has already lasted) for a continuous period of 90 days or more, or for 120 days in any 180 consecutive day period. Termination as a result of a Disability will not be construed as a termination by the Company "without Cause."

7.6.   "Good Reason" means any of the following, without the Executive's prior consent: (a) a material diminution of the Executive's duties and responsibilities from those in effect immediately prior to the diminution that is not accompanied by a separate increase or expansion of the Executive's duties and responsibilities; (b) a material reduction in Base Salary (other than a reduction that is imposed proportionately on all members of the Company's executive management team); or (c) a relocation of the Executive's principal worksite of more than 100 miles unless such relocation reduces the Executive's commute to such worksite. None of the foregoing events or conditions will constitute Good Reason unless the Executive provides the Company with written objection to the event or condition within 30 days following the occurrence thereof, the Company does not cure the event or condition within 30 days of receiving that written objection, and the Executive resigns his employment within 30 days following the expiration of that cure period.

7.7.   "Person" means any individual, firm, corporation, partnership, limited liability company, trust, joint venture, association, governmental entity, unincorporated entity or other entity.

8.   Miscellaneous.

8.1.   Cooperation. The Executive further agrees that, subject to reimbursement of his reasonable expenses, he will cooperate fully with the Company and its counsel with respect to any matter (including litigation, investigations, or governmental proceedings) in which

the Executive was in any way involved during his employment with the Company. The Executive shall render such cooperation in a timely manner on reasonable notice from the Company, so long as the Company exercises commercially reasonable efforts to schedule and limit its need for the Executive's cooperation under this paragraph so as not to interfere with the Executive's other personal and professional commitments.

8.2.    Section 409A.

8.2.1.    Notwithstanding anything herein to the contrary or otherwise, except to the extent any expense, reimbursement or in-kind benefit provided to the Executive does not constitute a "deferral of compensation" within the meaning of Section 409A of the Code, and its implementing regulations and guidance, (i) the amount of expenses eligible for reimbursement or in-kind benefits provided to the Executive during any calendar year will not affect the amount of expenses eligible for reimbursement or in-kind benefits provided to the Executive in any other calendar year, (ii) the reimbursements for expenses for which the Executive is entitled to be reimbursed shall be made on or before the last day of the calendar year following the calendar year in which the applicable expense is incurred and (iii) the right to payment or reimbursement or in-kind benefits hereunder may not be liquidated or exchanged for any other benefit.

8.2.2.    Anything to the contrary herein notwithstanding, all benefits or payments provided by the Company to the Executive that would be deemed to constitute "nonqualified deferred compensation" within the meaning of Section 409A of the Code are intended to comply with Section 409A of the Code. Notwithstanding anything in this Agreement to the contrary, distributions may only be made under this Agreement upon an event and in a manner permitted by Section 409A of the Code or an applicable exemption.

8.3.    Other Agreements. The Executive represents and warrants to the Company that there are no restrictions, agreements or understandings whatsoever to which he is a party that would prevent or make unlawful his execution of this Agreement, that would be inconsistent or in conflict with this Agreement or the Executive's obligations hereunder, or that would otherwise prevent, limit or impair the performance by the Executive of his duties under this Agreement.

8.4.    Survival of Covenants. Section 6 of this Agreement, including the agreements of the parties set forth therein, shall survive the termination of this Agreement.

8.5.    Successors and Assigns. The Company may assign this Agreement to any Affiliate or to any successor to its assets and business by means of liquidation, dissolution, merger, sale of assets or otherwise. Upon such assignment, the rights and obligations of the Company hereunder shall become the rights and obligations of such Affiliate or successor. For avoidance of doubt, a termination of the Executive's employment by the Company in connection with a permitted assignment of the Company's rights and obligations under this Agreement is not a termination "without Cause" so long as the assignee offers employment to the Executive substantially on the terms herein specified (without regard to whether the Executive accepts employment with the assignee). The rights and duties of the Executive hereunder are personal to Executive and may not be assigned by her.

8.6.    Governing Law and Enforcement. This Agreement will be governed by and construed in accordance with the laws of the State of Idaho, without regard to the principles of conflicts of laws. Any legal proceeding arising out of or relating to this Agreement will be instituted in a state or federal court in the State of Idaho, and the Executive and the Company hereby consent to the personal and exclusive jurisdiction of such court(s) and hereby waive any objection(s) that they may have to personal jurisdiction, the laying of venue of any such proceeding and any claim or defense of inconvenient forum.

8.7.    Waivers. The waiver by either party of any right hereunder or of any breach by the other party will not be deemed a waiver of any other right hereunder or of any other breach by the other party. No waiver will be deemed to have occurred unless set forth in a writing. No waiver will constitute a continuing waiver unless specifically stated, and any waiver will operate only as to the specific term or condition waived.

8.8.    Severability. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law. However, if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability will not affect any other provision, and this Agreement will be reformed, construed and enforced as though the invalid, illegal or unenforceable provision had never been herein contained.

8.9.    Survival. This Agreement will survive the cessation of the Executive's employment to the extent necessary to fulfill the purposes and intent of this Agreement.

8.10.   Notices. Any notice or communication required or permitted under this Agreement will be made in writing and (a) sent by reputable overnight courier, (b) mailed by overnight U.S. express mail, return receipt requested or (c) sent by fax or other electronic means. Any notice or communication to the Executive will be sent to the address contained in his personnel file. Any notice or communication to the Company will be sent to the Company's principal executive offices. Notwithstanding the foregoing, either party may change the address for notices or communications hereunder by providing written notice to the other in the manner specified in this paragraph.

8.11.   Withholding. All payments (or transfers of property) to the Executive will be subject to tax withholding to the extent required by applicable law.

8.12.   Section Headings. The headings of sections and paragraphs of this Agreement are inserted for convenience only and will not in any way affect the meaning or construction of any provision of this Agreement.

8.13.   Counterparts; Facsimile. This Agreement may be executed in multiple counterparts (including by facsimile or other electronic signature), each of which will be deemed to be an original, but all of which together will constitute but one and the same instrument.

8.14.   Entire Agreement; Amendments. This Agreement contains the entire agreement and understanding of the parties hereto relating to the subject matter hereof, and supersedes all prior discussions, agreements and understandings of every nature relating to that

subject matter. This Agreement may not be changed or modified, except by an agreement in writing signed by each of the parties hereto.

8.15. <u>Opportunity to Consult with Independent Counsel</u>. Executive acknowledges he has, or has been afforded the opportunity to, seek the advice of independent legal counsel, who has reviewed this Agreement in its entirety. Executive warrants that he understands, accepts, and agrees to, all terms herein. Executive accepts and agrees to all terms in this Agreement with full knowledge and understanding of their effect.

*(signature page follows)*

IN WITNESS WHEREOF, the Company has caused this Agreement to be executed by its duly authorized officer, and the Executive has executed this Agreement, in each case on the date first above written.

**THE COMPANY:**

**YELLOWSTONE PARTNERS, LLC**

By: _____
    Name: Eric M. Rubin_____
    Title: CEO_____

**EXECUTIVE:**

_____
KayLynn Dalebout

1403979

# Yellowstone Partners

# EMPLOYEE HANDBOOK

**Last Updated: September 2016**

EXHIBIT _B_

# Welcome

Welcome to Yellowstone Partners. We are delighted that you have chosen to join our organization and hope that you will enjoy a long and successful career with us. As you become familiar with our culture and mission, we hope you will take advantage of opportunities to enhance your career and further Yellowstone Partners' goals.

You are joining an organization that has a reputation for outstanding leadership and expertise. With your active involvement and support, Yellowstone Partners will continue to achieve its goals. We sincerely hope you will take pride in being an important part of Yellowstone Partners' success.

Please take time to review the policies contained in this handbook. Compliance with these policies is a condition of employment. If you have questions, feel free to ask your supervisor or to contact KayLynn Dalebout, the Human Resources Director.

**Office Hours:**
Monday through Friday:    7:30 a.m. to 5:00 p.m.
Saturday and Sunday:      Closed

**Phone Numbers:**
Idaho Falls      (208) 612-1000
Salt Lake City   (801) 990-0880

**Address:**
3340 Merlin Dr. 101
Idaho Falls, ID 83404

**Web / Social media:**
www.yellowstonepartners.com
www.linkedin.com/company/1777485
www.twitter.com/yellowstonep
www.facebook.com/yellowstonepartners

# Disclaimer

This handbook is intended only to outline the employment policies, procedures and benefits of Yellowstone Partners. This manual is not intended to be all-inclusive and should not be considered to be an employment contract. Yellowstone Partners reserves the right to change employment policies, procedures, benefits or this manual at any time without notice. It is the responsibility of the employee to stay abreast of policy. Yellowstone Partners will make every effort to notify employees of any policy changes, additions or deletions. Said changes will immediately become a part of this manual.

"The treasure of the vast Yellowstone landscape was not created overnight."

# Time Off and Leaves of Absence

### Holidays

Yellowstone Partners provides the following holiday schedule for all employees:

- New Year's Day
- Presidents' Day
- Memorial Day
- Independence Day
- Labor Day
- Thanksgiving Day
- Day after Thanksgiving
- Christmas Day

Eligible employees qualify for paid days. Non-qualifying employees are required to take the days off without pay, unless otherwise approved in writing by your immediate supervisor.

Any additional holidays will be designated by the company at start of each calendar year.

If one of these holidays falls on a Sunday, it will be observed on the following Monday. If the holiday falls on a Saturday, it will be observed the preceding Friday as a substitute holiday

**Religious observances.** Employees who need time off to observe religious practices or holidays not already scheduled by the company should speak with their supervisor. Depending upon business needs, the employee may be able to work on a day that is normally observed as a holiday and then take time off for another religious day. Employees may also be able to switch a scheduled day with another employee, or take vacation time, or take off unpaid days. The company will seek to reasonably accommodate individuals' religious observances.

### Vacation

Yellowstone Partners recognizes the importance of time off from work to relax, spend time with family, and enjoy leisure activities. The company provides paid vacation time to full-time employees for this purpose and employees are encouraged to take vacation during the year. Part-time employees who are regularly scheduled to work 20 or more hours per week will be eligible for paid vacation on a pro rata schedule.

Full-time employees will accrue paid vacation according to the following schedule (annual totals should be rounded to the nearest whole day):

| Service Period | Annual Vacation Accrual |
|---|---|
| Calendar Years 1 - 4 | 15 Days |
| Calendar Years 5 and over | 20 Days |

Employees may not take paid vacation until they actually have earned or accrued the vacation time. New employees accrue paid vacation at the start of employment but may not take any vacation until they have completed at least 3 months of employment.

Generally, employees should submit vacation plans to their supervisor at least 4 weeks in advance of the requested vacation date. Vacation may be scheduled in increments of 1 full work day up to a maximum of 2 weeks in a row.

Vacation should be used in the year it is earned. Employees will be permitted to carry-over up to 5 days of accrued vacation to the following calendar year.

Employees whose employment terminates, will be paid for unused vacation time that has accrued during the calendar year of the termination.

## Sick Leave

Leave of absence due to sickness will be deducted from the vacation days available to the employee.

If the need for sick leave is foreseeable, employees are required to give at least 30 days' advance notice (e.g., a planned medical treatment) whenever possible. If the need for sick leave is not foreseeable, employees are asked to notify their supervisor as soon as is practical.

If an employee 5 or more consecutive days because of illness, Yellowstone Partners may require the employee to provide a physician's written permission to return to work.

Attending work while ill is not permissible, and the Human Resources Director has discretion to request an employee to leave and use a vacation day if the Human Resources Director considers the employee's illness makes them unfit to work or puts other employees at risk of becoming ill.

## Family and Medical Leave

Yellowstone Partners complies with the federal Family and Medical Leave Act (FMLA), which requires employers to grant unpaid leaves of absence to qualified workers for certain medical and family-related reasons.

Please note there are many requirements, qualifications, and exceptions under these laws, and each employee's situation is different. Contact the Human Resources Department to discuss options for leave.

**Reasons for Taking Leave.** Under federal law, unpaid leave may be requested for pregnancy and prenatal care; preplacement activities, birth, adoption, or foster placement of a child; or the serious health condition of a child, spouse, parent, domestic partner, or the employee.

**Military Family Leave Entitlements.** Under federal law, unpaid leave may also be requested by eligible employees who have any qualifying exigency arising out of the fact that the spouse or a son, daughter, parent, domestic partner, or next of kin of the employee is on covered active duty (or has been notified of an impending call or order to covered active duty) in the armed forces and may use their 12-week entitlement to address certain qualifying circumstances.

"The treasure of the vast Yellowstone landscape was not created overnight."

Qualifying circumstances may include deploying on short-notice, attending certain military events, arranging for alternative child care and school activities, addressing certain financial and legal arrangements, attending certain counseling sessions, engaging in rest and recuperation, and attending post deployment reintegration briefings.

The federal FMLA also includes a special leave entitlement that permits eligible employees to take up to 26 weeks of leave to care for a covered service member during a single 12-month period. This leave applies if the employee is the spouse, son, daughter, parent, domestic partner, or next of kin caring for a covered military service member or veteran recovering from an injury or illness suffered while on active duty in the armed forces or that existed before the beginning of the member's active duty and was aggravated by service or that manifested itself before or after the member became a veteran.

**Leave Designation.** If an employee does not expressly request FMLA leave, the company reserves the right to designate a qualifying absence as FMLA leave and will give notice of the FMLA designation to the employee. If an absence is a qualifying event under FMLA, the leave will run concurrent with short-term disability, long-term disability, PTO, workers' compensation, and/or any other leave where permitted by state and federal law.

**Benefits.** Under federal law, employers must continue healthcare benefits during FMLA leave as though the employees were still at work and must pay the employer's part of the premium. The employee will continue to be responsible for the employee's portion of the premium as well.

**Interaction with Accrued Paid Time Off.** FMLA leave, and paid vacation or sick time will run concurrently as provided under company policy except where prohibited by state law.

**Job Protection.** An employee's job, or an equivalent job, is protected while the employee is on leave. Both federal and applicable state laws require that employees be returned to their positions or to another job of like pay and status at the end of FMLA leave.

Note: If an employee is unable to return to work after the expiration of federal or state FMLA, an extension may be granted if the condition constitutes a disability under the Americans with Disabilities Act (ADA) or in certain workers' compensation cases.

**Return-to-Work Policy.** When such work is available, the company will attempt to provide an employee with a temporary modified or light-duty assignment in accordance with documented medical restrictions.

"The treasure of the vast Yellowstone landscape was not created overnight."

## Military Leave

Yellowstone Partners supports the military obligations of all employees and grants leaves for uniformed service in accordance with applicable federal and state laws. Any employee who needs time off for uniformed service should immediately notify the Human Resources Department and his or her supervisor, who will provide details regarding the leave. If an employee is unable to provide notice before leaving for uniformed service, a family member should notify the supervisor as soon as possible.

Upon return from military leave, employees will be granted the same seniority, pay, and benefits as if they had worked continuously. Failure to report for work within the prescribed time after completion of military service will be considered a voluntary termination.

All employees who enter military service may accumulate a total absence of 5 years and still retain employment rights.

## Bereavement Leave

Employees with more than 3 months' service may take up to 3 days of paid bereavement leave (subject to deduction from their annual vacation days) upon the death of a member of their immediate family. "Immediate family members" are defined as an employee's spouse, domestic partner, parents, stepparents, siblings, children, stepchildren, grandparent, father-in-law, mother-in-law, brother-in-law, sister-in-law, son-in-law, daughter-in-law, or grandchild. All regular, full-time employees may take up to one 1 day off with pay (also subject to deduction from annual vacation days) to attend the funeral of an extended family member (aunts, uncles, and cousins) or a friend.

The company may require verification of the need for the leave. The employee's supervisor and Human Resources will consider this time off on a case-by-case basis.

Payment for bereavement leave is computed at the regular hourly rate to a maximum of 8 hours for 1 day. Time off granted in accordance with this policy shall not be credited as time worked for the purpose of computing overtime.

If requested, additional unpaid time off may be approved by Yellowstone Partners' Management team. Contact the Human Resources Director concerning your specific needs.

## Jury Duty/Court Appearance

The company supports employees in their civic duty to serve on a jury. Employees must present any summons to jury duty to their supervisor as soon as possible after receiving the notice to allow advance planning for an employee's absence.

Time off from work will be granted as necessary in order to serve on a jury.

If an employee is released from jury duty after 4 hours or less of service, he or she must report to work for the remainder of that work day.

Time for appearance in court for personal business will be the individual employee's responsibility. Normally, personal days or vacation days will be used for this purpose.

"The treasure of the vast Yellowstone landscape was not created overnight."

**Time Off for Voting**

Yellowstone Partners recognizes that voting is an integral part of being in a community. In almost all cases, you will have sufficient time outside working hours to vote. If for any reason you think this won't be the case, contact your supervisor to discuss scheduling accommodations.

**Personal Leave**

Yellowstone Partners will make every reasonable effort to consider personal leave of absence. Apply for unpaid personal leave of absence authorization from the Human Resources Director. Many factors are considered when determining eligibility for personal leave of absence and is granted or denied solely at the discretion of Yellowstone Partners. When granted, the maximum allowable is 30 days per calendar year.

## Workers' Compensation

Workers' compensation is a "no-fault" system that provides compensation for medical expenses and wage losses to employees who are injured or who become ill because of employment.

Yellowstone Partners pays the entire cost of workers' compensation insurance. The insurance provides coverage for related medical and rehabilitation expenses and a portion of lost wages to employees who sustain an injury on the job.

The company abides by all applicable state workers' compensation laws and regulations.

If an employee sustains a job-related injury or illness, it is important to notify the supervisor and Human Resources immediately. The supervisor will complete an injury report with input from the employee and return the form to the Human Resources Department. Human Resources will file the claim with the insurance company.

Workers' compensation benefits (paid or unpaid) will run concurrently with FMLA leave, if applicable, where permitted by state and federal law.

## Flexible Spending Accounts

Yellowstone Partners offers Flexible Spending Accounts (FSA) including both Dependent Care Spending Account (DCSA) and Health Care Spending Account (HCSA) benefits to full-time employees working a minimum of 30 hours per week. FSA provide a tax free-free reimbursement to employees for health care and dependent care expenses not reimbursed by any other insurance or reimbursement program.

## Employee Assistance Program

The Employee Assistance Program (EAP) is a resource designed to provide highly confidential and experienced help for employees in dealing with issues that affect their lives and the quality of their job performance. Yellowstone Partners wants employees to be able to maintain a healthy balance of work and family that allows them to enjoy life. The EAP is a confidential counseling and referral service that can help employees successfully deal with life's challenges.

This free, comprehensive counseling service offers employees three visits per issue each year, and a 24-hour hotline answered by professional, degreed counselors. For legal or financial issues, employees receive a 25 percent discount on any services that might be needed.

The company encourages employees to use this valuable service whenever they have such a need. Employees who choose to use these counseling services are assured the information disclosed in their sessions is confidential and not available to the company, nor is the company given any information on who chooses to use the services. For questions or additional information about this program, employees may contact the Human Resources Department.

## Education – Tuition Reimbursement

Yellowstone Partners offers Education – tuition reimbursement benefits to full-time employees working a minimum of 30 hours per week. Qualifying employees wishing to further their formal

education or participate in trade-specific training may qualify for reimbursement of all or part of the cost of tuition and books for classes. Authorization from the Yellowstone Partners management team must be granted prior to enrolling in classes.

Not all education programs qualify and tuition reimbursement may vary depending on the chosen courses. Agreements for continued employment may be required in some cases. See your immediate supervisor for details. Yellowstone Partners reserves the right to modify or eliminate this program without notice.

### Relocation Expense

Yellowstone Partners does pay some relocation expenses for new hires or employees offered full time positions requiring relocation if the distance of the move is 200 miles or greater. The amount of expense refunded may vary based on the employment position in question, the distance of the move and other factors to be determined by Yellowstone Partners' management team.

## Disclaimer

Benefits to employees are provided at the will of Yellowstone Partners and Yellowstone Partners reserves the right to modify or eliminate benefits without notice under conditions of law.

"The treasure of the vast Yellowstone landscape was not created overnight."

# Yellowstone Partners, LLC
## Accounting Policies and Procedures Manual

# Yellowstone Partners, LLC
## Accounting Policies and Procedures Manual

## Table of Contents

| | |
|---|---|
| Introduction | 1 |
| Division of Duties | 2 |
| Cash Receipts Procedures | 4 |
| Cash Disbursements Procedures | 6 |
| Reconciliations | 8 |
| Petty Cash Fund | 11 |
| Purchases | 12 |
| Fixed Asset Management | 15 |
| Payroll | 16 |
| Financial Reporting | 18 |
| Grant Compliance | 19 |
| Fiscal Policy Statements | 21 |
| Annual Meeting Checklist | 23 |
| Computer System Backup Procedures | 24 |

# Introduction

This manual has been prepared to document the internal accounting procedures for Yellowstone Partners. Its purpose is to ensure that assets are safeguarded, that financial statements are in conformity with generally accepted accounting principles, and that finances are managed with responsible stewardship.

All personnel with a role in the management of Yellowstone Partners' fiscal operations are expected to uphold the policies in this manual. It is the intention of Yellowstone Partners that this accounting manual serve as our commitment to proper, accurate financial management and reporting.

*Revised: 09/16*

# Division of Duties

The following is a list of personnel who have responsibilities within the accounting department:

## President:

1. Reviews and approves all financial reports.
2. Reviews and approves annual budget.
3. Reviews the payroll summary for the correct payee, hours worked and check amount.
4. Reviews all vouchers and invoices for those checks which require his or her signature.
5. Reviews and approves all contracts for goods and services that will exceed $10,000 over the year.

## Vice President:

1. Approves all vouchers, invoices and checks.
2. Receives unopened bank statements.
3. With the Fiscal Manager, and input from the President and Program Directors, develops the annual budget.
4. Reviews and approves all financial reports.
5. Reviews and approves list of pending check disbursements.
6. Reviews all vouchers and invoices for those checks which require his or her signature.
7. Authorizes all interfund transfers.
8. Reviews all bank reconciliations.
9. Reviews the payroll summary for the correct payee, hours worked and check amount.
10. Approves all reimbursements.
11. Manages the assets accounts.

## Fiscal Manager:

1. Processes all receipts and disbursements.
2. Processes the payroll, including payroll tax returns.
3. Submits requests for interfund transfers.
4. Maintains and reconciles the general ledger monthly.
5. With the Vice President, and with input from the President and Department Directors, develops the annual budget.
6. Prepares all financial reports, including requests for reimbursements.
7. Manages the petty cash fund.
8. Reconciles the bank accounts.
9. Reconciles the statement of credit card deposits and service charges.
10. Double-checks all reimbursement requests against receipts provided.

## Office Assistant/Receptionist:

1. Receives and opens all incoming mail, **except** the bank statements.
2. Prepares cash receipts log and invoice log.
3. Mails all checks for payments.

4.   Processes credit card payments for publications.

*Director with Most Seniority:* (currently the Director of Programs)
1.   Acts as second signatory on checks.
2.   Reviews all vouchers and invoices for those checks which require his or her signature.

*All Department Directors:*
1.   Develops first draft of department budgets and works with the Vice President and President to finalize.
2.   Accountability to approved departmental budgets in purchasing decisions and in preparing check request vouchers with the proper account code.

*Designated Board Members* (Currently the Chair, Vice Chair, and Treasurer)
1.   Check signing authority on all Yellowstone Partners accounts.
2.   Authorizes expenditures in excess of $10,000, except preapproved capital expenditures (such as rent) which might exceed $10,000.

# Cash Receipts Procedures

The Office Assistant receives all incoming mail. All checks received by the Office Assistant should be recorded on a cash receipts log which states the department to which the income is attributed, and stamped For Deposit Only. The Office Assistant then makes two copies of the check with one copy forwarded to the Fiscal Manager and the other copy to the responsible department. A copy of the cash receipts log will be given to the Vice President on a daily basis.

Next, the Fiscal Manager prepares a deposit slip and deposits the funds into the checking account. The validated deposit slip should be attached to the Fiscal Managers cash receipts log and filed. All check copies should be filed according to month received.

A deposit not forwarded or mailed to the bank should be locked in the accounting departments lock box. No deposit should be locked in the file cabinet for more than 24 hours. If the funds are mailed to the bank, the Fiscal Manager should indicate the date mailed and received on the cash receipts log. The Fiscal Manager should make a copy of each check mailed and file them in a separate file folder.

No single account should contain more than $100,000 - or the amount over which the FDIC will not insure.

## _Funds Received by Wire Transfer:_

The Vice President will request a wire transfer of funds. This request will be prepared by the Fiscal Manager and should be signed by the Vice President. Where appropriate - as in reimbursement of federal funds - the Fiscal Manager should forward a project financial statement to the Vice President who prepares a request for reimbursement or advance and files or mails the necessary documents, providing a copy to the Fiscal Manager.

Next, the Fiscal Manager will monitor the transfer of funds and maintain the appropriate records of this transaction.

As soon as the funds are credited to the Yellowstone Partners checking account, the bank should send a credit memo to the Fiscal Manager. The Fiscal Manager should reconcile these credit memos to the total cash received at the end of the month.

In the absence of the Vice President, the President or, in dire emergencies, the Treasurer of the Board of Directors, should authorize wire transfers.

## _Inter-Fund Transfers:_

The Yellowstone Partners operating checking account should not exceed $100,000 at any time. All funds received should be deposited into the checking

account. It will be necessary to transfer funds funds from the savings account into the checking account. In order to transfer funds from the savings into the checking account, the following procedures should be followed:

The Fiscal Manager should monitor the balance in the checking account, and determine if there are adequate funds to pay the daily expenses. The Fiscal Manager should prepare a transfer memo for signature by the Vice President to transfer the necessary amounts from the savings account to the checking account, as long as the remaining balance does not exceed $100,000. These transfers will occur concurrently with the associated disbursements.

# Cash Disbursements Procedures

1. Incoming invoices will be logged in by the Office Assistant (naming the staff person responsible for ordering the product or service) and delivered to the responsible staff person for his/her approval and to prepare a check request voucher prior to disbursement dates.

2. The staff person responsible for ordering the product or service will check the validity of the invoice against proposals/bids, etc. and work accomplished and/or delivered and prepare a check request voucher prior to disbursement dates.

3. Twice monthly on the 1st and 16th days (or the next business day if the date falls on a weekend or holiday), cash disbursements should be prepared by the Fiscal Manager for signature by authorized Yellowstone Partners officials for expenses, debts and liabilities of Yellowstone Partners.

4. The Fiscal Manager is responsible for the preparation of disbursements. All disbursements are to be made by check unless the item is considered a petty cash item.

5. A check request voucher should then be completed by the purchasing staff person and attached to the original vendor invoice, and/or any other supporting documentation. The voucher should include the account codes to which the expense will be applied. Approval for an expense by the Vice President must be indicated on the check request voucher.

6. After inputting all the check requests, the Fiscal Manager will prepare a master list of all checks to be paid for approval by the President or Vice President. If there are any questions or concerns about the amounts, the Fiscal Manager should provide necessary information prior to running any disbursements. If there are any items removed from the batch, the totals on the payment summary form should be corrected, initialed and dated by the President or Vice President.

7. The Fiscal Manager should then run an aging accounts payable, which is generated by the accounting software. A total of the disbursements to be paid will be recorded on the form and sent to the Vice President for approval, along with the current balance in any and all cash accounts.

8. Once the amount to be disbursed has been received, the Fiscal Manager should print the checks from the computer system. The checks should be attached to the invoice, and other supporting documentation, being paid and submitted for signatures. A check register should be run and filed together with the disbursement transmittal form.

9. While the President, Vice President, and/or Director signs each check, he/she should double check the check request voucher. This approval is to ensure the account and grant/project is charged to the correct expense and line item. Any checks made to pay invoices in excess of $10,000 must be signed by the President and authorized for payment in writing by one of the Board of

Directors authorized for signature.

10. After the checks have been signed, the second signatory will double-check the work, cancel the invoice by stamping "PAID" on it in red ink, and pass the checks on to the Office Assistant for mailing. In the event that the Office Assistant is out, the administrative assistant will assume these duties.

11. All checks will be mailed as soon as this process is completed.

12. Supporting documentation should be filed by the Fiscal Manager in appropriate vendor files.

13. The Fiscal Manager will utilize the paid invoice files to respond to any discrepancies which arise with vendors or other payees.

14. Once monthly, the fiscal manager will check the invoice log to determine if there are any outstanding invoices which have not yet been paid. If so, the fiscal manager will investigate the nonpayment of these invoices with the responsible staff member.

# Reconciliations

_Cash Flow:_

Yellowstone Partners is to maintain a minimum of ten percent (10%) of the operating budget between its operating and savings bank accounts at all times. In the event that balances fall below that amount the President and Treasurer should be notified immediately.

_Bank Reconciliations:_

1.  Bank statements are to be received unopened by the Vice President. The receiving party should review the contents for inconsistent check numbers, signatures, cash balances and payees and endorsements at a minimum. After this cursory review is conducted, the official should initial and date the bottom, right hand corner of the first page of each bank statement reviewed. The reviewed bank statement should then be forwarded to the Fiscal Manager (an individual without check signing rights) to reconcile the bank accounts using the approved reconciliation form.

2.  The person charged with this responsibility should reconcile each account promptly upon receipt of the bank statements. All accounts will be reconciled no later than 7 days after receipt of the monthly bank statements. In the event it is not possible to reconcile the bank statements in this period of time, the President or Vice President should be notified by a written memo from the Fiscal Manager.

3.  When reconciling the bank accounts, the following items should be included in the procedures:

    a.  A comparison of dates and amounts of daily deposits as shown on the bank statements with the cash receipts journal.

    b.  A comparison of inter-organization bank transfers to be certain that both sides of the transactions have been recorded on the books.

    c.  An investigation of items rejected by the bank, i.e., returned checks or deposits.

    d.  A comparison of wire transfers dates received with dates sent.

    e.  A comparison of canceled checks with the disbursement journal as to check number, payee and amount.

    f.  An accounting for the sequence of checks both from month to month and within a month.

    g.  An examination of canceled checks for authorized signatures, irregular endorsements, and alterations.

    h.  A review and proper mutilation of void check.

    i.  Investigate and write off checks which have been outstanding for more than six months.

–9–

4. Completed bank reconciliations should be reviewed by the Vice President and initialed and dated by the reviewer.

5. The Fiscal Manager upon receipt of the completed bank reconciliations, prepares any general ledger adjustments.

6. Copies of the completed bank reconciliations will be forwarded to the Treasurer for his/her review.

## Reconciliations of Other General Ledger Accounts:

1. Each month the Fiscal Manager and Vice President should review the ending balance shown on balance sheet accounts such as the cash accounts, accounts receivable, accounts payable and deferred revenue. The Fiscal Manager and Vice President should review the bank reconciliations, schedules of accounts receivable and deferred revenue and the aging of accounts payable to support the balances shown on the balance sheet.

2. Assets - These accounts will include cash, petty cash, prepaids, property, equipment and fixtures, security deposits, and intangible assets.

   a. Cash - The balances in cash accounts should agree with the balances shown on the bank reconciliations for each month.

   b. Petty Cash - The balance in this account should always equal the maximum amount of all petty cash funds. The current amount equals $100.00.

   c. Prepaids - The amounts in these accounts should equal advance payments paid to vendors at the end of the accounting period.

   d. Property, Equipment & Fixtures - The amounts in this account should equal the totals generated from the audited depreciation schedules. When additional purchases are made during the year, the balances in the accounts may be updated accordingly.

3. Liabilities - These accounts are described as accounts payable, payroll tax liabilities, loans and mortgages payable, and amounts due to others.

   a. Accounts Payable - The balance in this account should equal amounts owed to vendors at the end of the accounting period and the aging report.

   b. Payroll Tax Liabilities - The amounts in these accounts should equal amounts withheld from employee paychecks as well as the employers portion of the expense for the period, that has not been remitted to the government authorities.

   c. Due to Others - If there are any amounts owed to others at the end of the period they should be recorded and the correct balance maintained in the general ledger accounts.

4.  Income/Expenses - These accounts are described as income from membership, contributions, publications, and other expense line items such as salaries, consulting fees, etc.

    a.  Income - The amounts charged to the various cash accounts should be reconciled with funding requests, funders reports, draw down schedules, etc.

    b.  Gross Salary Accounts - The balances in the gross salary accounts should be added together and reconciled with the amounts reported on quarterly payroll returns.

    c.  Consulting - The amounts charged should be reconciled to the contracts.

# Petty Cash Fund

1. The petty cash fund should never exceed $100.00.

2. The Fiscal Manager is the custodian of the petty cash fund.

3. A single disbursement from petty cash shall never exceed $25.00.

4. The petty cash fund shall be operated on an impress basis. This means that when it is time to replenish the petty cash fund, the Fiscal Manager shall total out the expenses made and identify those expenses by general ledger account number. When the check request is submitted for payment it should indicate the total amount needed to bring the fund back up to $100.00. Also, the check request should breakdown the various expense accounts being charged and the amount charged to each.

5. When a request for petty cash reimbursement is made to the Fiscal Manager, the item will be listed on the Petty Cash Fund Reconciliation Sheet. A description of the item charged should be recorded together with the amount. A vendor receipt must be received by the Fiscal Manager for the amount of the request in order for the request to be approved.

6. The recipient of the petty cash funds must sign the sheet to indicate receipt of the funds. The paid receipt should be attached to the sheet. All paid information should remain in the locked petty cash box until it is time to replenish the fund. At that time, the Petty Cash Fund Reconciliation Sheet and associated receipts are attached to the check request voucher.

7. The petty cash box is to be locked at all times when the Fiscal Manager is not disbursing or replenishing the fund. The locked petty cash box is to be kept in the locked file cabinets within the finance office.

8. At least once annually, the President or Vice President should conduct a "surprise review" of the fund. When this is done, he/she should count, while the Fiscal Manager is in attendance, the total monies on hand and the total amount of receipts in the petty cash box. The two amounts should equal exactly $100.00. Any discrepancies should be discussed and resolved immediately.

9. It is a policy of Yellowstone Partners not to cash checks of any kind through the petty cash fund.

10. The Yellowstone Partners postage meter is not to be used for personal mailings under any circumstances. Staff may use the UPS service provided they indicate that the mailing is personal and reimburse Yellowstone Partners at the time the appropriate invoice is paid.

# Purchases

*To Prompt a Purchase:*

1. When the normal cash disbursement procedure of invoice, etc., is not appropriate, (i.e., postage, petty cash, etc.) a check request should be completed and forwarded with any order form or other documentation to the President or Vice President for approval. If the check is made out to either the Vice President or President, that individual cannot approve the check request voucher.

2. Approved check requests should be sent to the Fiscal Manager for payment.

3. In the absence of backup materials, receipts for the purchase must be provided to the Fiscal Manager for attachment to the check request within two weeks from the check date.

*Credit Card Purchases:*

1. Only the President and Vice President carry corporate credit cards in his or her name. The purchase of airline tickets and other authorized business expenditures may be made by other employees or board members using the corporate credit card. In every case of credit card usage, the individual charging a Yellowstone Partners account will be held personally responsible in the event that the charge is deemed personal or unauthorized.

2. Authorized uses of the credit card include:

   a. Airline or rail tickets (at coach class or lower rates) for properly authorized business trips. Yellowstone Partners designated travel agency will require that employees supply the travel agency with an account code in order to charge to the Yellowstone Partners American Express. The account code will help reconcile the costs of travel with the proper Yellowstone Partners program to be charged. The travel agency will provide Yellowstone Partners a monthly report of all travel charged to the American Express.

   b. Lodging and meal charges that do not exceed the authorized reimbursement rate for persons traveling on official Yellowstone Partners business

   c. Car rental charges (for mid-size or smaller vehicles) for properly authorized business trips

   d. Properly authorized expenditures for which a credit card is the only allowed method of payment (such as monthly internet access)

   e. Business telephone calls

   f. Properly authorized entertainment at a rate which is consistent with the employee=s level of responsibility within, or on behalf of, Yellowstone Partners and within the limits of the approved budget.

3. Receipts should be compiled and submitted with an expense report on a weekly basis.

4.  Unauthorized use of the credit card includes:

    a.  Personal or non-business expenditures of any kind.

    b.  Expenditures which have not been properly authorized.

    c.  Meals, entertainment, gifts or other expenditures which are prohibited by:

        1.  Yellowstone Partners budget and/or policies

        2.  Federal, state, or local laws or regulations

        3.  Grant conditions or policies of the entities from which Yellowstone Partners receives funds.

### Proper Documentation for all Purchases, including Company Credit Card Purchases:

Every instance of credit card or other purchase use must be documented with travel authorizations, receipts, individuals paid for, nature of business, etc. before the expense will be considered authorized and will be approved for reimbursement. See details below.

A.  Lodging - Provide an itemized receipt from the hotel detailing every charge and the name of the person(s) for whom lodging was provided.

B.  Meals/Entertainment - Provide a receipt showing separately the cost for food/beverage and gratuities, and including the names of every person for whom food or beverage was provided and the specific business purpose which was furthered by the expenditure.

C.  Other Expenditures - A receipt from the vendor detailing every individual good or service purchased (including class of service for commercial transportation) accompanied by an explanation of the specific business purpose which was furthered by each expenditure. For example, A Round trip coach flight from Washington to New York for Conference Director John Doe to review hotel proposals and facilities for the 2012 Yellowstone Partners annual conference.

The Fiscal Manager will double-check all reimbursement requests against receipts provided and run a calculator tape which will be attached to the reimbursement form.

### Capital Expenditures:

For all major expenditures such as computers, furniture, audit services, printing services, etc., three bids must be obtained before a purchasing decision is made. If the annual amount will exceed $2,000, a bidding process and review will be conducted. All bids, including phone quotes, must be recorded and kept on file.

### Consultants:

Contracts with consultants will include rate and schedule of pay, deliverables, time frame, and other information such as work plan, etc. Justification for payment should be submitted to file. For example, if Yellowstone Partners hired a writer to create a publication, a copy of the final version should be included in the file.

### Contracts:

Contracts for purchasing products or services, similar to a purchase order, should be created and maintained for the file whenever appropriate. All contracts to exceed $10,000 over the course of the year should be approved by the President.

# Fixed Asset Management

1. A permanent property log or database is to be maintained by the Fiscal Manager for all fixed assets purchased by Yellowstone Partners.

2. The log should contain the following information:

   a. Date of purchase

   b. Description of item purchased

   c. Received by donation or purchased

   d. Cost or fair market value on the date receipt

   e. Donor or funding source, if applicable

   f. Funding source restrictions on use or disposition

   g. Identification/serial number (if appropriate)

   h. Depreciation period

   i. Vendor name and address

   j. Warranty period

   k. Inventory tag number (all fixed assets should be tagged with a unique identifying number)

   l. Number of the Yellowstone Partners check used to pay for the equipment

3. At least annually, a physical inspection and inventory should be taken of all Yellowstone Partners fixed assets and reconciled to the general ledger balances. Adjustments for dispositions should be made.

4. The Fiscal Manager should be informed, in writing, via an interoffice memorandum of any material changes in the status of property and equipment. This should include changes in location, sale of, scrapping of and/or obsolescence of items and any purchase or sale of real estate.

5. All capital items which have a cost greater than $250.00 will be capitalized and depreciated.

# Payroll

## *Personnel:*

1. The Fiscal Manager is charged with the responsibility of maintaining personnel files on staff persons.
2. Each personnel file should contain the following information, at a minimum.
   a. Employment application or resume
   b. A record of background investigation
   c. Date of employment
   d. Position, pay rates and changes therein
   e. Authorization of payroll deductions
   f. Earnings records for non-active employees
   g. W-4 Form, withholding authorization
   h. I-9 Immigration Form
   I. Termination data, when applicable
3. All personnel records are to be kept locked in a locking file cabinet in the Fiscal Manager's office. Access to these files other than by the Fiscal Manager, President, Vice President or the auditor should be requested in writing to the President.

## *Payroll Preparation and Timekeeping:*

1. Timesheets are to be prepared by all staff persons and submitted semi-monthly on the 15th and last day of each month. Time should be input on a daily basis and, if in writing, completed in ink. Correction fluid should never be used in preparing timesheets. If an error needs to be corrected, a line should be drawn through the item and the corrected information recorded, and initialed by the person who made the correction.
2. Timesheets are to include specific time spent on each grant/project.
3. Timesheets are to be signed by the staff person and his/her supervisor.
4. All approved timesheets should be submitted to the Fiscal Manager, who will verify the hours worked against his/her record.
5. The Fiscal Manager should then process the time and report the information to the payroll service bureau. The information reported should include:
   a. Hours worked, by cost center
   b. Changes in pay rates or employment status

– 16 –

   c.   Vacation, sick or personal hours used and earned

6.   The President or Vice President should review the payroll summary page of the payroll service report for inappropriate payees or unusual hours.

7.   Paychecks should be distributed by the Fiscal Manager on the designated day and hour, one week after the end of the pay period according to a prearranged schedule distributed by the Fiscal Manager. In the event that a paycheck is picked up by a designated person other than the staff person, a memo should be received in writing from the staff person and proper identification should be requested from the party picking up the pay check.

8.   As an employee benefit, Yellowstone Partners offers direct deposit through the employee's own financial institution and also offers cost-free checking through [Bank Name]. Through direct deposit, payroll is deposited as cash into the employee's account on payday.

# Financial Reporting

## Monthly Reports:

The Fiscal Manager should prepare a set of monthly financial reports for distribution to the President, and the Budget and Finance Committee. The reports should include: a balance sheet and a statement of income and expenses for each department (operating, project); a consolidated balance sheet and consolidated income and expense report which show all departments combined; a budget-to-actual report for all accounts included in the annual operating budget; a list of deferred and receivable funds, and a cash flow projection. In addition, the monthly reports for the quarterly periods (December, March, June, and September) will be submitted to the full board for their review and acceptance at the following board meeting.

The monthly statements should be reviewed by the President or Vice President prior to distribution to the Treasurer for initial comments. After the Treasurer's approval, the statements will be mailed to the Budget and Finance Committee every month and to the full board as stated above. The monthly statements will be finalized by the conclusion of the month following the statement period.

## Year-End Report/Audit:

At fiscal year-end, and in time for the winter retreat of the Board of Directors, a year-end Audit report should be prepared summarizing the total income and expense activity for the year. A balance sheet should be prepared as of December 31 and should be attached to the income and expense report. This report will be initially reviewed by the President and Vice President, and then by the Treasurer, prior to distribution at the annual meeting.

Bids for an independent auditor to conduct this review will be accepted between November 15 and December 31. In accordance with Yellowstone Partners policy, at least three proposals will be considered. The auditing process will begin on or about February 1.

*Yellowstone Partners*

# EMPLOYEE HANDBOOK ACKNOWLEDGMENT AND RECEIPT

I hereby acknowledge receipt of the employee handbook of Yellowstone Partners. I understand and agree that it is my responsibility to read and comply with the policies in the handbook.

I understand that the handbook and all other written and oral materials provided to me are intended for informational purposes only. Neither it, company practices, nor other communications create an employment contract or term. I understand that the policies and benefits, both in the handbook and those communicated to me in any other fashion, are subject to interpretation, review, and change by management at any time without notice.

I further agree that neither this document nor any other communication shall bind the company to employ me now or hereafter and that my employment may be terminated by me or the company without reason at any time. I understand that no representative of the company has any authority to enter into any agreement for employment for any specified period of time or to assure any other personnel action or to assure any benefits or terms or conditions of employment, or make any agreement contrary to the foregoing.

I also understand and agree that this agreement may not be modified orally and that only the president of the company may make a commitment for employment. I also understand that if such an agreement is made, it must be in writing and signed by the president of the company.

KAYLYNN Dalebout
**Employee's Name in Print**

*(signature)*
**Signature of Employee**

10 | 11 | 2016
**Date Signed by Employee**

**TO BE PLACED IN EMPLOYEE'S PERSONNEL FILE**

EXHIBIT C

Tingey, Joel E.

Electronically Filed
3/19/2019 4:15 PM
Seventh Judicial District, Bonneville County
Penny Manning, Clerk of the Court
By: Melissa Huston, Deputy Clerk

MARK R. FULLER (ISB No. 2698)
DANIEL R. BECK (ISB No. 7237)
PAUL FULLER (ISB No. 8435)
FULLER & BECK LAW OFFICES, PLLC
410 MEMORIAL DRIVE, SUITE 201
P.O. BOX 50935
IDAHO FALLS, ID 83405-0935
TELEPHONE: (208) 524-5400
EMAIL: FULLERANDBECK@GMAIL.COM

ATTORNEYS FOR PLAINTIFF

# IN THE DISTRICT COURT OF THE SEVENTH JUDICIAL DISTRICT OF THE STATE OF IDAHO IN AND FOR THE COUNTY OF BONNEVILLE

| | |
|---|---|
| YELLOWSTONE PARTNERS, LLC, an Idaho limited liability company, ) ) ) | Case No. CV10-19-1674 |
| Plaintiff, ) ) | |
| v. ) ) | **SUMMONS** |
| KAYLYNN DALEBOUT, a divorced woman, ) ) ) | |
| Defendant. ) ) | |

## TO: KAYLYNN DALEBOUT

**NOTICE:** YOU HAVE BEEN SUED BY THE ABOVE-NAMED PLAINTIFF(S). THE COURT MAY ENTER JUDGMENT AGAINST YOU WITHOUT FURTHER NOTICE UNLESS YOU RESPOND WITHIN 20 DAYS.

READ THE INFORMATION BELOW:

You are hereby notified that in order to defend this lawsuit, an appropriate written response must be filed with the above-designated Court within twenty (20) days after service of this Summons on you. If you fail to so respond, the Court may enter Judgment against you as demanded by the Plaintiff(s) in the

Complaint.

A copy of the Complaint is served with this Summons. If you wish to seek the advice or representation of an attorney in this matter, you should do so promptly so that your written response, if any, may be filed in time and your legal rights protected.

An appropriate written response requires compliance with Idaho Rule of Civil Procedure 10(a)(1) and other applicable Idaho Rules of Civil Procedure and shall also include:

1. The title and number of this case.

2. If your response is an Answer to the Complaint, it must contain admissions or denials of the separate allegations of the Complaint and other defenses you may claim.

3. Your signature, mailing address and telephone number, or the signature, mailing address and telephone number of your attorney.

4. Proof of mailing or delivery of a copy of your response to Plaintiff's attorney as designated above.

To determine whether you must pay a filing fee with your response, contact the Clerk of the above-named Court.

DATED _3/19/2019_____.

Penny Manning

CLERK OF THE COURT

BY: _Melissa Heston_____

Deputy Clerk

# Exhibit B

## Case Information

CV10-19-1674 | Yellowstone Partners, LLC Plaintiff, vs. KayLynn Dalebout
Defendant.

| Case Number | Court | Judicial Officer |
|---|---|---|
| CV10-19-1674 | Bonneville County District Court | Tingey, Joel E. |

| File Date | Case Type | Case Status |
|---|---|---|
| 03/19/2019 | AA- All Initial District Court Filings (Not E, F, and H1) | Active - Pending |

## Party

Plaintiff
Yellowstone Partners, LLC

Active Attorneys ▾
Lead Attorney
Fuller, Mark
Russell
Retained

Defendant
Dalebout, KayLynn

## Events and Hearings

03/19/2019 Initiating Document - District

03/19/2019 Complaint Filed ▾

Comment
Verified Complaint and Demand for Jury Trial

03/19/2019 Summons Issued

03/19/2019 Civil Case Information Sheet

## Financial

Yellowstone Partners, LLC

| | | | | |
|---|---|---|---|---|
| Total Financial Assessment | | | | $221.00 |
| Total Payments and Credits | | | | $221.00 |
| 3/19/2019 | Transaction Assessment | | | $221.00 |
| 3/19/2019 | EFile Payment | Receipt # 10866-2019-R10 | Yellowstone Partners, LLC | ($221.00) |

Exhibit C

MARK R. FULLER (ISB No. 2698)
DANIEL R. BECK (ISB No. 7237)
FULLER & BECK LAW OFFICE, PLLC
410 MEMORIAL DRIVE, SUITE 201
P.O. BOX 50935
IDAHO FALLS, ID 83405-0935
TELEPHONE: (208) 524-5400
FACSIMILE: (208) 524-7167

ATTORNEY FOR PLAINTIFF

## IN THE DISTRICT COURT OF THE SEVENTH JUDICIAL DISTRICT OF THE STATE OF IDAHO IN AND FOR THE COUNTY OF BONNEVILLE

| | |
|---|---|
| YELLOWSTONE PARTNERS, LLC, an Idaho limited liability company,<br><br>          Plaintiff,<br><br>v.<br><br>KAYLYNN DALEBOUT a divorced woman,<br><br>          Defendant. | Case No. CV-10-19-1674<br><br>**PLAINTIFFS' FIRST REQUEST FOR DISCOVERY** |

TO: KAYLYNN DALEBOUT and her counsel of record:

Under authority of Rule 33, Idaho Rules of Civil Procedure, you are hereby requested to answer in writing, and under oath, within thirty (30) days from the receipt hereof, the following Interrogatories:

Each of the Interrogatories is deemed to be continuing and Yellowstone Partners, LLC (hereafter "Plaintiff") makes demand upon the Defendant that in the event that at any later date the Defendant obtains any additional facts, or obtain or make any assumptions, or reach any conclusion or opinions which are different from those set forth in her Answers to the Interrogatories within, that in each such case the Defendant amend her Answers to

these Interrogatories promptly and sufficiently prior to trial to fully set forth such additional facts, assumptions, conclusions, opinions, and/or contentions.

## INSTRUCTIONS AND DEFINITIONS

Note A:      The following terms, words, and phrases shall have the following meanings in this discovery pleading:

A.1.  The term "you" and "your" expressly refers to Defendant, Kaylynn Dalebout (hereafter "Defendant"), and any agent or representative of Defendant.

A.2.  The term "documents" shall mean any kind of written, printed, typed, graphic or photographic matter of any kind or nature, however produced or reproduced, and all mechanical and electronic sound recordings and written transcripts thereof, however produced or reproduced, whether in your control or not, and including without limitation, originals, all file copies, all other copies no matter how or by whom prepared, and all drafts of such documents, whether used or not.

A.3.  The term "identify" when used with respect to a document, or the description or identification of a document, shall be deemed to request the nature and substance of the document with sufficient particularity to enable the same to be requested and shall include the date, if any, which the document bears, the names of all persons authorizing the document, and the name and address of the custodian(s) of the original.

A.4.  The term "identify" when used with respect to a person, shall be deemed to request the person's full name, the person's last known business address, (if a natural person), the person's last known residence, and the person's business and residence telephone numbers.

A.5.  The term "identify" when used with respect to oral communications, shall be deemed to request the date and place thereof, whether said communication was in person or by telephone, an identification (as provided in definition A.4) of each person who participated in or heard any part of said communication, and the substance of what was said by each person who participated in said communication.

A.6.  The term "identify" when used with respect to the transfer of real or personal property, shall be deemed to request the date of transfer, the full name and business address of all parties to the transfer, a legal description of the real property involved and the consideration exchanged for the transfer.

Note B:

B.1. These Interrogatories are continuing in character, so as to require you to file supplementary answers in a reasonable manner if you obtain further or different information before trial.

B.2.  Where knowledge or information in possession of a party is requested, such request includes information and knowledge either in your possession, under your control, within your dominion, or available to you, of whether this is in your personal possession, or is possessed by your agents, attorneys, servants, employees, independent contractors, representatives, insurers or others with whom you have a relationship and from who you are capable of deriving information, documents or material.

B.3.  Each Interrogatory shall be accorded a separate answer and each subpart of an Interrogatory shall be accorded a separate answer.

Interrogatory No. 1:  Please list and identify all exhibits you intend or expect to

introduce into evidence at any hearings or trial of the above-entitled matter and state the name and address of the person presently having possession of each exhibit.

Interrogatory No. 2:  Please list and identify each and every fact witness you intend or plan to call to testify at the trial in this action and provide a brief summary of the facts to which each such witness will testify.

Interrogatory No. 3: Please list and identify each and every person who has, or who may have, knowledge related to the facts of this case. For each such person please identify (1) the person's name; (2) any contact information you possess for such person, including phone, email, and/or address; (3) a brief description of the facts known or believed to be possessed by such person.

Interrogatory No. 4:  Please identify each and every expert witness you plan to call to testify at the trial in this action. As to each expert witness, please provide (1) a complete statement of all opinions to be expressed and the basis and reasons therefore; (2) the data or other information considered by the witness in forming the opinions; (3) any exhibits to be used as a summary of or support for the opinions; (4) any qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; (5) the compensation to be paid for the expert testimony; and (6) a listing of any other cases in which the witness has testified as an expert by trial or by deposition within the preceding four years.

Interrogatory No.5:  Please identify all terms of any agreement you assert exists or existed between You and the Plaintiff with regard to the subject matter of this litigation.

Interrogatory No. 6: Please identify all communications between You and the

Plaintiff, whether oral, or in writing, from January 1, 2015 to the present regarding the subject of this litigation. For each such communication, please identify: (1) the date upon which the communication occurred; (2) whether the communication was oral or in writing; (3) all parties present or participating in such communications; and (4) the substance of the communication.

Interrogatory No. 7: Please identify all bonuses you received while employed by Yellowstone Partners, LLC and for each such bonus please identify: (1) the amount of such bonus; (2) the person(s) who authorized such bonus; (3) the date you accepted such bonus; and (4) the purpose, if any, of the bonus.

Interrogatory No. 8: Please identify all vacation days you used while employed by Yellowstone Partners, LLC, and for each such vacation day please identify: (1) the individual(s) who authorized such vacation days; (2) the dates that you used such vacation days; and (3) the purpose of such vacation days.

Interrogatory No. 9: Please identify all reimbursements for professional or other expenses you received while employed by Yellowstone Partners, LLC, and for each such reimbursement, please identify (1) the individual(s) who pre-authorized incurring such expense; (2) the amount of the expense that was reimbursed; (3) the purpose of the expense; and (4) the date the expense was incurred.

Interrogatory No. 10: Please identify all checks you received from Yellowstone Partners which were signed by only one individual, including checks that were signed only by You, and for each such check identify (1) the number of the check; (2) the date the check was issued; (3) the amount of such check; (4) the purpose of such check; and (5)

the individual that signed such check on behalf of Yellowstone Partners.

Interrogatory No. 11: Submitted herewith are Plaintiff's First Requests for Admission. As to each Request not unconditionally admitted, please set forth in detail each fact upon which you rely in denying each such Request for Admission.

## REQUESTS FOR PRODUCTION

COMES NOW Plaintiff, by and through its attorney of record, Mark R. Fuller of Fuller & Beck Law Offices, PLLC, pursuant to Idaho Rule of Civil Procedure 34 and requests that Defendant, produce the following documents and things for inspection and copying at the offices of Fuller & Beck Law Offices, PLLC, 410 Memorial Drive, Suite 201, Idaho Falls, Idaho, within thirty (30) days from the service hereof, unless some other time and place is mutually agreed upon by the parties.

## INSTRUCTIONS AND DEFINITIONS

Note A:        The following terms, words, and phrases shall have the following meanings in this discovery pleading:

A.1. This request is intended to cover all the documents in possession of Defendant and her agents, representatives, consultants, and attorneys of the Defendant, or those subject to her custody or control, or otherwise reasonably available to her, regardless of the actual location of the documents.

A.2. As used herein, the term 'document' or 'documents' shall mean any kind of written, graphic, symbolic, recorded, and photographic matter of any kind or nature, however produced or reproduced, and electronic sound recordings and written transcripts thereof, in your actual or constructive possession, custody, care or control or otherwise available to

you and all drafts of such documents, whether used or not.

Note B:  If you withhold any documents by reason of a claim of privilege or other reason, please identify such document, including its date, general subject matter (without disclosing the contents), persons to whom distributed and basis upon which the privilege is claimed.

Note C:  These requests are deemed to be continuing so as to require supplemental responses if you or your attorney, agents, employees, or representatives obtain further documentation or requested information between the time these responses are served and the time of trial.

Request No. 1:  Please produce a copy of each and every document which You intend to submit as an exhibit at trial or any hearing to be held in this action.

Request No. 2:  Please produce a copy of any written or recorded statements made by any potential witnesses in this case, including the parties or their employees or agents, regarding the subject of this litigation.

Request No. 3:  Please produce a copy of any correspondence you sent to any officers or employees of Plaintiff in this matter, whether by mail, email, text message, or otherwise, regarding the subject matter of this litigation.

Request No. 4:  Please produce a copy of any correspondence you received from any officer or employee of Plaintiff in this matter, whether by mail, email, text message, or otherwise, regarding the subject matter of this litigation.

Request No.5:  Please produce a copy of all agreements between Plaintiff and Defendant with regard to the subject matter of this litigation from 2015 to the present.

Request No. 6: Please produce a true and correct copy of all authorizations you received from Plaintiff to take vacation time.

Request No. 7: Please produce a true and correct copy of all authorizations you received from Plaintiff to repay expenses you assert were incurred on behalf of Plaintiff.

Request No. 8: Please produce a true and correct copy of authorizations you received from Plaintiff to pay yourself any bonus from Plaintiff.

Request No. 9: Please produce a true and correct copy of authorizations you received from Plaintiff to be the sole signor on any check issued by Plaintiff.

## REQUESTS FOR ADMISSION

YOU ARE HEREBY REQUESTED to admit the truth of the following matters, which are relevant to the subject matter involved in the above mentioned pending cause, within the scope of Idaho Rules of Civil Procedure 36(b).

Failure to serve a written answer or objection within thirty (30) days after service hereof, the time allowed by I.R.C.P. 36(a), will result in admissions to the following requests:

Request for Admission No. 1:    Please admit that you were employed by Yellowstone Partners as Human Resources Director from August, 2016 until September, 2017.

Request for Admission No. 2:    Please admit that you were employed by Yellowstone Partners as its Chief Financial Officer from August, 2016 until September, 2017.

Request for Admission No. 3:    Please admit that you drafted the Employee

Handbook and Accounting Policies and Procedures Manual for Yellowstone Partners attached hereto as Exhibit "A."

Request for Admission No. 4:    Please admit that you received a copy of the Employee Handbook and Accounting Policies and Procedures Manual for Yellowstone Partners attached hereto as Exhibit "A."

Request for Admission No. 5:    Please admit that you agreed to abide by the terms of the Employee Handbook and Accounting Policies and Procedures Manual for Yellowstone Partners attached hereto as Exhibit "A."

Request for Admission No. 6:    Please admit that you did not follow the policies and procedures in the Employee Handbook and Accounting Policies and Procedures Manual, attached hereto as Exhibit "A" with regard to vacation days you took while employed by Plaintiff.

Request for Admission No. 7:    Please admit that you did not follow the policies and procedures in the Employee Handbook and Accounting Policies and Procedures Manual, attached hereto as Exhibit "A" with regard to expense reimbursements you received while employed by Plaintiff.

Request for Admission No. 8:    Please admit that you did not follow the policies and procedures in the Employee Handbook and Accounting Policies and Procedures Manual, attached hereto as Exhibit "A" with regard to check #1485, which you signed on behalf of Plaintiff, payable to yourself on July 13, 2017.

DATED this _____ day of _____, 2019.

FULLER & BECK LAW OFFICES, PLLC

_____
Mark R. Fuller
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I served a true and correct copy of the following described

pleading or document on the attorney listed below on this _____ day of _____,

2019:

Document Served:                    FIRST REQUEST FOR DISCOVERY

Attorney Served:

_____, Esq.                    _____ U.S. Mail
_____                          _____ Facsimile
_____                          _____ Hand Delivery


                                    _____
                                    Mark R. Fuller
                                    FULLER & BECK LAW OFFICES, PLLC

# Yellowstone Partners

# EMPLOYEE HANDBOOK

Last Updated: September 2016

*Yellowstone Partners*

EXHIBIT A

# Welcome

Welcome to Yellowstone Partners. We are delighted that you have chosen to join our organization and hope that you will enjoy a long and successful career with us. As you become familiar with our culture and mission, we hope you will take advantage of opportunities to enhance your career and further Yellowstone Partners' goals.

You are joining an organization that has a reputation for outstanding leadership and expertise. With your active involvement and support, Yellowstone Partners will continue to achieve its goals. We sincerely hope you will take pride in being an important part of Yellowstone Partners' success.

Please take time to review the policies contained in this handbook. Compliance with these policies is a condition of employment. If you have questions, feel free to ask your supervisor or to contact KayLynn Dalebout, the Human Resources Director.

**Office Hours:**
Monday through Friday:   7:30 a.m. to 5:00 p.m.
Saturday and Sunday:     Closed

**Phone Numbers:**
Idaho Falls        (208) 612-1000
Salt Lake City     (801) 990-0880

**Address:**
3340 Merlin Dr. 101
Idaho Falls, ID 83404

**Web / Social media:**
www.yellowstonepartners.com
www.linkedin.com/company/1777485
www.twitter.com/yellowstonep
www.facebook.com/yellowstonepartners

# Disclaimer

This handbook is intended only to outline the employment policies, procedures and benefits of Yellowstone Partners. This manual is not intended to be all-inclusive and should not be considered to be an employment contract. Yellowstone Partners reserves the right to change employment policies, procedures, benefits or this manual at any time without notice. It is the responsibility of the employee to stay abreast of policy. Yellowstone Partners will make every effort to notify employees of any policy changes, additions or deletions. Said changes will immediately become a part of this manual.

"The treasure of the vast Yellowstone landscape was not created overnight."

# Time Off and Leaves of Absence

**Holidays**

Yellowstone Partners provides the following holiday schedule for all employees:

- New Year's Day
- Presidents' Day
- Memorial Day
- Independence Day
- Labor Day
- Thanksgiving Day
- Day after Thanksgiving
- Christmas Day

Eligible employees qualify for paid days. Non-qualifying employees are required to take the days off without pay, unless otherwise approved in writing by your immediate supervisor.

Any additional holidays will be designated by the company at start of each calendar year.

If one of these holidays falls on a Sunday, it will be observed on the following Monday.  If the holiday falls on a Saturday, it will be observed the preceding Friday as a substitute holiday

**Religious observances.**  Employees who need time off to observe religious practices or holidays not already scheduled by the company should speak with their supervisor.  Depending upon business needs, the employee may be able to work on a day that is normally observed as a holiday and then take time off for another religious day.  Employees may also be able to switch a scheduled day with another employee, or take vacation time, or take off unpaid days.  The company will seek to reasonably accommodate individuals' religious observances.

**Vacation**

Yellowstone Partners recognizes the importance of time off from work to relax, spend time with family, and enjoy leisure activities. The company provides paid vacation time to full-time employees for this purpose and employees are encouraged to take vacation during the year. Part-time employees who are regularly scheduled to work 20 or more hours per week will be eligible for paid vacation on a pro rata schedule.

Full-time employees will accrue paid vacation according to the following schedule (annual totals should be rounded to the nearest whole day):

| Service Period | Annual Vacation Accrual |
| --- | --- |
| Calendar Years 1 - 4 | 15 Days |
| Calendar Years 5 and over | 20 Days |

"The treasure of the vast Yellowstone landscape was not created overnight."

Employees may not take paid vacation until they actually have earned or accrued the vacation time. New employees accrue paid vacation at the start of employment but may not take any vacation until they have completed at least 3 months of employment.

Generally, employees should submit vacation plans to their supervisor at least 4 weeks in advance of the requested vacation date. Vacation may be scheduled in increments of 1 full work day up to a maximum of 2 weeks in a row.

Vacation should be used in the year it is earned. Employees will be permitted to carry-over up to 5 days of accrued vacation to the following calendar year.

Employees whose employment terminates, will be paid for unused vacation time that has accrued during the calendar year of the termination.

### Sick Leave

Leave of absence due to sickness will be deducted from the vacation days available to the employee.

If the need for sick leave is foreseeable, employees are required to give at least 30 days' advance notice (e.g., a planned medical treatment) whenever possible.  If the need for sick leave is not foreseeable, employees are asked to notify their supervisor as soon as is practical.

If an employee 5 or more consecutive days because of illness, Yellowstone Partners may require the employee to provide a physician's written permission to return to work.

Attending work while ill is not permissible, and the Human Resources Director has discretion to request an employee to leave and use a vacation day if the Human Resources Director considers the employee's illness makes them unfit to work or puts other employees at risk of becoming ill.

### Family and Medical Leave

Yellowstone Partners complies with the federal Family and Medical Leave Act (FMLA), which requires employers to grant unpaid leaves of absence to qualified workers for certain medical and family-related reasons.

Please note there are many requirements, qualifications, and exceptions under these laws, and each employee's situation is different. Contact the Human Resources Department to discuss options for leave.

**Reasons for Taking Leave.** Under federal law, unpaid leave may be requested for pregnancy and prenatal care; preplacement activities, birth, adoption, or foster placement of a child; or the serious health condition of a child, spouse, parent, domestic partner, or the employee.

**Military Family Leave Entitlements.** Under federal law, unpaid leave may also be requested by eligible employees who have any qualifying exigency arising out of the fact that the spouse or a son, daughter, parent, domestic partner, or next of kin of the employee is on covered active duty (or has been notified of an impending call or order to covered active duty) in the armed forces and may use their 12-week entitlement to address certain qualifying circumstances.

"The treasure of the vast Yellowstone landscape was not created overnight."

Qualifying circumstances may include deploying on short-notice, attending certain military events, arranging for alternative child care and school activities, addressing certain financial and legal arrangements, attending certain counseling sessions, engaging in rest and recuperation, and attending post deployment reintegration briefings.

The federal FMLA also includes a special leave entitlement that permits eligible employees to take up to 26 weeks of leave to care for a covered service member during a single 12-month period. This leave applies if the employee is the spouse, son, daughter, parent, domestic partner, or next of kin caring for a covered military service member or veteran recovering from an injury or illness suffered while on active duty in the armed forces or that existed before the beginning of the member's active duty and was aggravated by service or that manifested itself before or after the member became a veteran.

**Leave Designation.** If an employee does not expressly request FMLA leave, the company reserves the right to designate a qualifying absence as FMLA leave and will give notice of the FMLA designation to the employee. If an absence is a qualifying event under FMLA, the leave will run concurrent with short-term disability, long-term disability, PTO, workers' compensation, and/or any other leave where permitted by state and federal law.

**Benefits.** Under federal law, employers must continue healthcare benefits during FMLA leave as though the employees were still at work and must pay the employer's part of the premium. The employee will continue to be responsible for the employee's portion of the premium as well.

**Interaction with Accrued Paid Time Off.** FMLA leave, and paid vacation or sick time will run concurrently as provided under company policy except where prohibited by state law.

**Job Protection.** An employee's job, or an equivalent job, is protected while the employee is on leave. Both federal and applicable state laws require that employees be returned to their positions or to another job of like pay and status at the end of FMLA leave.

Note: If an employee is unable to return to work after the expiration of federal or state FMLA, an extension may be granted if the condition constitutes a disability under the Americans with Disabilities Act (ADA) or in certain workers' compensation cases.

**Return-to-Work Policy.** When such work is available, the company will attempt to provide an employee with a temporary modified or light-duty assignment in accordance with documented medical restrictions.

**Military Leave**

Yellowstone Partners supports the military obligations of all employees and grants leaves for uniformed service in accordance with applicable federal and state laws. Any employee who needs time off for uniformed service should immediately notify the Human Resources Department and his or her supervisor, who will provide details regarding the leave. If an employee is unable to provide notice before leaving for uniformed service, a family member should notify the supervisor as soon as possible.

Upon return from military leave, employees will be granted the same seniority, pay, and benefits as if they had worked continuously. Failure to report for work within the prescribed time after completion of military service will be considered a voluntary termination.

All employees who enter military service may accumulate a total absence of 5 years and still retain employment rights.

**Bereavement Leave**

Employees with more than 3 months' service may take up to 3 days of paid bereavement leave (subject to deduction from their annual vacation days) upon the death of a member of their immediate family. "Immediate family members" are defined as an employee's spouse, domestic partner, parents, stepparents, siblings, children, stepchildren, grandparent, father-in-law, mother-in-law, brother-in-law, sister-in-law, son-in-law, daughter-in-law, or grandchild. All regular, full-time employees may take up to one 1 day off with pay (also subject to deduction from annual vacation days) to attend the funeral of an extended family member (aunts, uncles, and cousins) or a friend.

The company may require verification of the need for the leave. The employee's supervisor and Human Resources will consider this time off on a case-by-case basis.

Payment for bereavement leave is computed at the regular hourly rate to a maximum of 8 hours for 1 day. Time off granted in accordance with this policy shall not be credited as time worked for the purpose of computing overtime.

If requested, additional unpaid time off may be approved by Yellowstone Partners' Management team. Contact the Human Resources Director concerning your specific needs.

**Jury Duty/Court Appearance**

The company supports employees in their civic duty to serve on a jury. Employees must present any summons to jury duty to their supervisor as soon as possible after receiving the notice to allow advance planning for an employee's absence.

Time off from work will be granted as necessary in order to serve on a jury.

If an employee is released from jury duty after 4 hours or less of service, he or she must report to work for the remainder of that work day.

Time for appearance in court for personal business will be the individual employee's responsibility. Normally, personal days or vacation days will be used for this purpose.

"The treasure of the vast Yellowstone landscape was not created overnight."

**Time Off for Voting**

Yellowstone Partners recognizes that voting is an integral part of being in a community. In almost all cases, you will have sufficient time outside working hours to vote. If for any reason you think this won't be the case, contact your supervisor to discuss scheduling accommodations.

**Personal Leave**

Yellowstone Partners will make every reasonable effort to consider personal leave of absence. Apply for unpaid personal leave of absence authorization from the Human Resources Director. Many factors are considered when determining eligibility for personal leave of absence and is granted or denied solely at the discretion of Yellowstone Partners. When granted, the maximum allowable is 30 days per calendar year.

"The treasure of the vast Yellowstone landscape was not created overnight."

**Workers' Compensation**

Workers' compensation is a "no-fault" system that provides compensation for medical expenses and wage losses to employees who are injured or who become ill because of employment.

Yellowstone Partners pays the entire cost of workers' compensation insurance. The insurance provides coverage for related medical and rehabilitation expenses and a portion of lost wages to employees who sustain an injury on the job.

The company abides by all applicable state workers' compensation laws and regulations.

If an employee sustains a job-related injury or illness, it is important to notify the supervisor and Human Resources immediately. The supervisor will complete an injury report with input from the employee and return the form to the Human Resources Department. Human Resources will file the claim with the insurance company.

Workers' compensation benefits (paid or unpaid) will run concurrently with FMLA leave, if applicable, where permitted by state and federal law.

**Flexible Spending Accounts**

Yellowstone Partners offers Flexible Spending Accounts (FSA) including both Dependent Care Spending Account (DCSA) and Health Care Spending Account (HCSA) benefits to full-time employees working a minimum of 30 hours per week. FSA provide a tax free-free reimbursement to employees for health care and dependent care expenses not reimbursed by any other insurance or reimbursement program.

**Employee Assistance Program**

The Employee Assistance Program (EAP) is a resource designed to provide highly confidential and experienced help for employees in dealing with issues that affect their lives and the quality of their job performance. Yellowstone Partners wants employees to be able to maintain a healthy balance of work and family that allows them to enjoy life. The EAP is a confidential counseling and referral service that can help employees successfully deal with life's challenges.

This free, comprehensive counseling service offers employees three visits per issue each year, and a 24-hour hotline answered by professional, degreed counselors. For legal or financial issues, employees receive a 25 percent discount on any services that might be needed.

The company encourages employees to use this valuable service whenever they have such a need. Employees who choose to use these counseling services are assured the information disclosed in their sessions is confidential and not available to the company, nor is the company given any information on who chooses to use the services. For questions or additional information about this program, employees may contact the Human Resources Department.

**Education – Tuition Reimbursement**

Yellowstone Partners offers Education – tuition reimbursement benefits to full-time employees working a minimum of 30 hours per week. Qualifying employees wishing to further their formal

"The treasure of the vast Yellowstone landscape was not created overnight."

education or participate in trade-specific training may qualify for reimbursement of all or part of the cost of tuition and books for classes. Authorization from the Yellowstone Partners management team must be granted prior to enrolling in classes.

Not all education programs qualify and tuition reimbursement may vary depending on the chosen courses. Agreements for continued employment may be required in some cases. See your immediate supervisor for details. Yellowstone Partners reserves the right to modify or eliminate this program without notice.

**Relocation Expense**

Yellowstone Partners does pay some relocation expenses for new hires or employees offered full time positions requiring relocation if the distance of the move is 200 miles or greater. The amount of expense refunded may vary based on the employment position in question, the distance of the move and other factors to be determined by Yellowstone Partners' management team.

# Disclaimer

Benefits to employees are provided at the will of Yellowstone Partners and Yellowstone Partners reserves the right to modify or eliminate benefits without notice under conditions of law.

"The treasure of the vast Yellowstone landscape was not created overnight."

# Yellowstone Partners, LLC
# Accounting Policies and Procedures Manual

# Yellowstone Partners, LLC
## Accounting Policies and Procedures Manual

## Table of Contents

| | |
|---|---|
| Introduction | 1 |
| Division of Duties | 2 |
| Cash Receipts Procedures | 4 |
| Cash Disbursements Procedures | 6 |
| Reconciliations | 8 |
| Petty Cash Fund | 11 |
| Purchases | 12 |
| Fixed Asset Management | 15 |
| Payroll | 16 |
| Financial Reporting | 18 |
| Grant Compliance | 19 |
| Fiscal Policy Statements | 21 |
| Annual Meeting Checklist | 23 |
| Computer System Backup Procedures | 24 |

# Introduction

    This manual has been prepared to document the internal accounting procedures for Yellowstone Partners. Its purpose is to ensure that assets are safeguarded, that financial statements are in conformity with generally accepted accounting principles, and that finances are managed with responsible stewardship.

    All personnel with a role in the management of Yellowstone Partners' fiscal operations are expected to uphold the policies in this manual. It is the intention of Yellowstone Partners that this accounting manual serve as our commitment to proper, accurate financial management and reporting.

*Revised: 09/16*

# Division of Duties

The following is a list of personnel who have responsibilities within the accounting department:

## *President:*
1. Reviews and approves all financial reports.
2. Reviews and approves annual budget.
3. Reviews the payroll summary for the correct payee, hours worked and check amount.
4. Reviews all vouchers and invoices for those checks which require his or her signature.
5. Reviews and approves all contracts for goods and services that will exceed $10,000 over the year.

## *Vice President:*
1. Approves all vouchers, invoices and checks.
2. Receives unopened bank statements.
3. With the Fiscal Manager, and input from the President and Program Directors, develops the annual budget.
4. Reviews and approves all financial reports.
5. Reviews and approves list of pending check disbursements.
6. Reviews all vouchers and invoices for those checks which require his or her signature.
7. Authorizes all interfund transfers.
8. Reviews all bank reconciliations.
9. Reviews the payroll summary for the correct payee, hours worked and check amount.
10. Approves all reimbursements.
11. Manages the assets accounts.

## *Fiscal Manager:*
1. Processes all receipts and disbursements.
2. Processes the payroll, including payroll tax returns.
3. Submits requests for interfund transfers.
4. Maintains and reconciles the general ledger monthly.
5. With the Vice President, and with input from the President and Department Directors, develops the annual budget.
6. Prepares all financial reports, including requests for reimbursements.
7. Manages the petty cash fund.
8. Reconciles the bank accounts.
9. Reconciles the statement of credit card deposits and service charges.
10. Double-checks all reimbursement requests against receipts provided.

## *Office Assistant/Receptionist:*
1. Receives and opens all incoming mail, **except** the bank statements.
2. Prepares cash receipts log and invoice log.
3. Mails all checks for payments.

4.  Processes credit card payments for publications.

_Director with Most Seniority:_ (currently the Director of Programs)
1.  Acts as second signatory on checks.
2.  Reviews all vouchers and invoices for those checks which require his or her signature.

_All Department Directors:_
1.  Develops first draft of department budgets and works with the Vice President and President to finalize.
2.  Accountability to approved departmental budgets in purchasing decisions and in preparing check request vouchers with the proper account code.

_Designated Board Members_ (Currently the Chair, Vice Chair, and Treasurer)
1.  Check signing authority on all Yellowstone Partners accounts.
2.  Authorizes expenditures in excess of $10,000, except preapproved capital expenditures (such as rent) which might exceed $10,000.

# Cash Receipts Procedures

The Office Assistant receives all incoming mail. All checks received by the Office Assistant should be recorded on a cash receipts log which states the department to which the income is attributed, and stamped For Deposit Only. The Office Assistant then makes two copies of the check with one copy forwarded to the Fiscal Manager and the other copy to the responsible department. A copy of the cash receipts log will be given to the Vice President on a daily basis.

Next, the Fiscal Manager prepares a deposit slip and deposits the funds into the checking account. The validated deposit slip should be attached to the Fiscal Managers cash receipts log and filed. All check copies should be filed according to month received.

A deposit not forwarded or mailed to the bank should be locked in the accounting departments lock box. No deposit should be locked in the file cabinet for more than 24 hours. If the funds are mailed to the bank, the Fiscal Manager should indicate the date mailed and received on the cash receipts log. The Fiscal Manager should make a copy of each check mailed and file them in a separate file folder.

No single account should contain more than $100,000 - or the amount over which the FDIC will not insure.

## Funds Received by Wire Transfer:

The Vice President will request a wire transfer of funds. This request will be prepared by the Fiscal Manager and should be signed by the Vice President. Where appropriate - as in reimbursement of federal funds - the Fiscal Manager should forward a project financial statement to the Vice President who prepares a request for reimbursement or advance and files or mails the necessary documents, providing a copy to the Fiscal Manager.

Next, the Fiscal Manager will monitor the transfer of funds and maintain the appropriate records of this transaction.

As soon as the funds are credited to the Yellowstone Partners checking account, the bank should send a credit memo to the Fiscal Manager. The Fiscal Manager should reconcile these credit memos to the total cash received at the end of the month.

In the absence of the Vice President, the President or, in dire emergencies, the Treasurer of the Board of Directors, should authorize wire transfers.

## Inter-Fund Transfers:

The Yellowstone Partners operating checking account should not exceed $100,000 at any time. All funds received should be deposited into the checking

account. It will be necessary to transfer funds funds from the savings account into the checking account. In order to transfer funds from the savings into the checking account, the following procedures should be followed:

The Fiscal Manager should monitor the balance in the checking account, and determine if there are adequate funds to pay the daily expenses. The Fiscal Manager should prepare a transfer memo for signature by the Vice President to transfer the necessary amounts from the savings account to the checking account, as long as the remaining balance does not exceed $100,000. These transfers will occur concurrently with the associated disbursements.

## Cash Disbursements Procedures

1.   Incoming invoices will be logged in by the Office Assistant (naming the staff person responsible for ordering the product or service) and delivered to the responsible staff person for his/her approval and to prepare a check request voucher prior to disbursement dates.

2.   The staff person responsible for ordering the product or service will check the validity of the invoice against proposals/bids, etc. and work accomplished and/or delivered and prepare a check request voucher prior to disbursement dates.

3.   Twice monthly on the 1st and 16th days (or the next business day if the date falls on a weekend or holiday), cash disbursements should be prepared by the Fiscal Manager for signature by authorized Yellowstone Partners officials for expenses, debts and liabilities of Yellowstone Partners.

4.   The Fiscal Manager is responsible for the preparation of disbursements. All disbursements are to be made by check unless the item is considered a petty cash item.

5.   A check request voucher should then be completed by the purchasing staff person and attached to the original vendor invoice, and/or any other supporting documentation. The voucher should include the account codes to which the expense will be applied. Approval for an expense by the Vice President must be indicated on the check request voucher.

6.   After inputting all the check requests, the Fiscal Manager will prepare a master list of all checks to be paid for approval by the President or Vice President. If there are any questions or concerns about the amounts, the Fiscal Manager should provide necessary information prior to running any disbursements. If there are any items removed from the batch, the totals on the payment summary form should be corrected, initialed and dated by the President or Vice President.

7.   The Fiscal Manager should then run an aging accounts payable, which is generated by the accounting software. A total of the disbursements to be paid will be recorded on the form and sent to the Vice President for approval, along with the current balance in any and all cash accounts.

8.   Once the amount to be disbursed has been received, the Fiscal Manager should print the checks from the computer system. The checks should be attached to the invoice, and other supporting documentation, being paid and submitted for signatures. A check register should be run and filed together with the disbursement transmittal form.

9.   While the President, Vice President, and/or Director signs each check, he/she should double check the check request voucher. This approval is to ensure the account and grant/project is charged to the correct expense and line item. Any checks made to pay invoices in excess of $10,000 must be signed by the President and authorized for payment in writing by one of the Board of

– 7 –

Directors authorized for signature.

10. After the checks have been signed, the second signatory will double-check the work, cancel the invoice by stamping "PAID" on it in red ink, and pass the checks on to the Office Assistant for mailing. In the event that the Office Assistant is out, the administrative assistant will assume these duties.

11. All checks will be mailed as soon as this process is completed.

12. Supporting documentation should be filed by the Fiscal Manager in appropriate vendor files:

13. The Fiscal Manager will utilize the paid invoice files to respond to any discrepancies which arise with vendors or other payees.

14. Once monthly, the fiscal manager will check the invoice log to determine if there are any outstanding invoices which have not yet been paid. If so, the fiscal manager will investigate the nonpayment of these invoices with the responsible staff member.

# Reconciliations

### Cash Flow:

Yellowstone Partners is to maintain a minimum of ten percent (10%) of the operating budget between its operating and savings bank accounts at all times. In the event that balances fall below that amount the President and Treasurer should be notified immediately.

### Bank Reconciliations:

1.  Bank statements are to be received unopened by the Vice President. The receiving party should review the contents for inconsistent check numbers, signatures, cash balances and payees and endorsements at a minimum. After this cursory review is conducted, the official should initial and date the bottom, right hand corner of the first page of each bank statement reviewed. The reviewed bank statement should then be forwarded to the Fiscal Manager (an individual without check signing rights) to reconcile the bank accounts using the approved reconciliation form.

2.  The person charged with this responsibility should reconcile each account promptly upon receipt of the bank statements. All accounts will be reconciled no later than 7 days after receipt of the monthly bank statements. In the event it is not possible to reconcile the bank statements in this period of time, the President or Vice President should be notified by a written memo from the Fiscal Manager.

3.  When reconciling the bank accounts, the following items should be included in the procedures:

    a.  A comparison of dates and amounts of daily deposits as shown on the bank statements with the cash receipts journal.

    b.  A comparison of inter-organization bank transfers to be certain that both sides of the transactions have been recorded on the books.

    c.  An investigation of items rejected by the bank, i.e., returned checks or deposits.

    d.  A comparison of wire transfers dates received with dates sent.

    e.  A comparison of canceled checks with the disbursement journal as to check number, payee and amount.

    f.  An accounting for the sequence of checks both from month to month and within a month.

    g.  An examination of canceled checks for authorized signatures, irregular endorsements, and alterations.

    h.  A review and proper mutilation of void check.

    i.  Investigate and write off checks which have been outstanding for more than six months.

4.  Completed bank reconciliations should be reviewed by the Vice President and initialed and dated by the reviewer.

5.  The Fiscal Manager upon receipt of the completed bank reconciliations, prepares any general ledger adjustments.

6.  Copies of the completed bank reconciliations will be forwarded to the Treasurer for his/her review.

*Reconciliations of Other General Ledger Accounts*:

1.  Each month the Fiscal Manager and Vice President should review the ending balance shown on balance sheet accounts such as the cash accounts, accounts receivable, accounts payable and deferred revenue. The Fiscal Manager and Vice President should review the bank reconciliations, schedules of accounts receivable and deferred revenue and the aging of accounts payable to support the balances shown on the balance sheet.

2.  Assets - These accounts will include cash, petty cash, prepaids, property, equipment and fixtures, security deposits, and intangible assets.

    a.  Cash - The balances in cash accounts should agree with the balances shown on the bank reconciliations for each month.

    b.  Petty Cash - The balance in this account should always equal the maximum amount of all petty cash funds. The current amount equals $100.00.

    c.  Prepaids - The amounts in these accounts should equal advance payments paid to vendors at the end of the accounting period.

    d.  Property, Equipment & Fixtures - The amounts in this account should equal the totals generated from the audited depreciation schedules. When additional purchases are made during the year, the balances in the accounts may be updated accordingly.

3.  Liabilities - These accounts are described as accounts payable, payroll tax liabilities, loans and mortgages payable, and amounts due to others.

    a.  Accounts Payable - The balance in this account should equal amounts owed to vendors at the end of the accounting period and the aging report.

    b.  Payroll Tax Liabilities - The amounts in these accounts should equal amounts withheld from employee paychecks as well as the employers portion of the expense for the period, that has not been remitted to the government authorities.

    c.  Due to Others - If there are any amounts owed to others at the end of the period they should be recorded and the correct balance maintained in the general ledger accounts.

4.  Income/Expenses - These accounts are described as income from membership, contributions, publications, and other expense line items such as salaries, consulting fees, etc.

    a.  Income - The amounts charged to the various cash accounts should be reconciled with funding requests, funders reports, draw down schedules, etc.

    b.  Gross Salary Accounts - The balances in the gross salary accounts should be added together and reconciled with the amounts reported on quarterly payroll returns.

    c.  Consulting - The amounts charged should be reconciled to the contracts.

# Petty Cash Fund

1.  The petty cash fund should never exceed $100.00.

2.  The Fiscal Manager is the custodian of the petty cash fund.

3.  A single disbursement from petty cash shall never exceed $25.00.

4.  The petty cash fund shall be operated on an impress basis. This means that when it is time to replenish the petty cash fund, the Fiscal Manager shall total out the expenses made and identify those expenses by general ledger account number. When the check request is submitted for payment it should indicate the total amount needed to bring the fund back up to $100.00. Also, the check request should breakdown the various expense accounts being charged and the amount charged to each.

5.  When a request for petty cash reimbursement is made to the Fiscal Manager, the item will be listed on the Petty Cash Fund Reconciliation Sheet. A description of the item charged should be recorded together with the amount. A vendor receipt must be received by the Fiscal Manager for the amount of the request in order for the request to be approved.

6.  The recipient of the petty cash funds must sign the sheet to indicate receipt of the funds. The paid receipt should be attached to the sheet. All paid information should remain in the locked petty cash box until it is time to replenish the fund. At that time, the Petty Cash Fund Reconciliation Sheet and associated receipts are attached to the check request voucher.

7.  The petty cash box is to be locked at all times when the Fiscal Manager is not disbursing or replenishing the fund. The locked petty cash box is to be kept in the locked file cabinets within the finance office.

8.  At least once annually, the President or Vice President should conduct a "surprise review" of the fund. When this is done, he/she should count, while the Fiscal Manager is in attendance, the total monies on hand and the total amount of receipts in the petty cash box. The two amounts should equal exactly $100.00. Any discrepancies should be discussed and resolved immediately.

9.  It is a policy of Yellowstone Partners not to cash checks of any kind through the petty cash fund.

10. The Yellowstone Partners postage meter is not to be used for personal mailings under any circumstances. Staff may use the UPS service provided they indicate that the mailing is personal and reimburse Yellowstone Partners at the time the appropriate invoice is paid.

# Purchases

## *To Prompt a Purchase:*

1. When the normal cash disbursement procedure of invoice, etc., is not appropriate, (i.e., postage, petty cash, etc.) a check request should be completed and forwarded with any order form or other documentation to the President or Vice President for approval. If the check is made out to either the Vice President or President, that individual cannot approve the check request voucher.

2. Approved check requests should be sent to the Fiscal Manager for payment.

3. In the absence of backup materials, receipts for the purchase must be provided to the Fiscal Manager for attachment to the check request within two weeks from the check date.

## *Credit Card Purchases:*

1. Only the President and Vice President carry corporate credit cards in his or her name. The purchase of airline tickets and other authorized business expenditures may be made by other employees or board members using the corporate credit card. In every case of credit card usage, the individual charging a Yellowstone Partners account will be held personally responsible in the event that the charge is deemed personal or unauthorized.

2. Authorized uses of the credit card include:

   a. Airline or rail tickets (at coach class or lower rates) for properly authorized business trips. Yellowstone Partners designated travel agency will require that employees supply the travel agency with an account code in order to charge to the Yellowstone Partners American Express. The account code will help reconcile the costs of travel with the proper Yellowstone Partners program to be charged. The travel agency will provide Yellowstone Partners a monthly report of all travel charged to the American Express.

   b. Lodging and meal charges that do not exceed the authorized reimbursement rate for persons traveling on official Yellowstone Partners business

   c. Car rental charges (for mid-size or smaller vehicles) for properly authorized business trips

   d. Properly authorized expenditures for which a credit card is the only allowed method of payment (such as monthly internet access)

   e. Business telephone calls

   f. Properly authorized entertainment at a rate which is consistent with the employee=s level of responsibility within, or on behalf of, Yellowstone Partners and within the limits of the approved budget.

3. Receipts should be compiled and submitted with an expense report on a weekly basis.

4.  Unauthorized use of the credit card includes:

   a.  Personal or non-business expenditures of any kind.

   b.  Expenditures which have not been properly authorized.

   c.  Meals, entertainment, gifts or other expenditures which are prohibited by:

      1.  Yellowstone Partners budget and/or policies

      2.  Federal, state, or local laws or regulations

      3.  Grant c o n d i t i o n s  or policies of the entities from which Yellowstone Partners receives funds.

## Proper Documentation for all Purchases, including Company Credit Card Purchases:

Every instance of credit card or other purchase use must be documented with travel authorizations, receipts, individuals paid for, nature of business, etc. before the expense will be considered authorized and will be approved for reimbursement. See details below.

A.  Lodging - Provide an itemized receipt from the hotel detailing every charge and the name of the person(s) for whom lodging was provided.

B.  Meals/Entertainment - Provide a receipt showing separately the cost for food/beverage and gratuities, and including the names of every person for whom food or beverage was provided and the specific business purpose which was furthered by the expenditure.

C.  Other Expenditures - A receipt from the vendor detailing every individual good or service purchased (including class of service for commercial transportation) accompanied by an explanation of the specific business purpose which was furthered by each expenditure. For example, A Round trip coach flight from Washington to New York for Conference Director John Doe to review hotel proposals and facilities for the 2012 Yellowstone Partners annual conference.

The Fiscal Manager will double-check all reimbursement requests against receipts provided and run a calculator tape which will be attached to the reimbursement form.

## Capital Expenditures:

For all major expenditures such as computers, furniture, audit services, printing services, etc., three bids must be obtained before a purchasing decision is made. If the annual amount will exceed $2,000, a bidding process and review will be conducted. All bids, including phone quotes, must be recorded and kept on file.

*Consultants*:

Contracts with consultants will include rate and schedule of pay, deliverables, time frame, and other information such as work plan, etc. Justification for payment should be submitted to file. For example, if Yellowstone Partners hired a writer to create a publication, a copy of the final version should be included in the file.

*Contracts*:

Contracts for purchasing products or services, similar to a purchase order, should be created and maintained for the file whenever appropriate. All contracts to exceed $10,000 over the course of the year should be approved by the President.

# Fixed Asset Management

1. A permanent property log or database is to be maintained by the Fiscal Manager for all fixed assets purchased by Yellowstone Partners.

2. The log should contain the following information:
    a. Date of purchase
    b. Description of item purchased
    c. Received by donation or purchased
    d. Cost or fair market value on the date receipt
    e. Donor or funding source, if applicable
    f. Funding source restrictions on use or disposition
    g. Identification/serial number (if appropriate)
    h. Depreciation period
    i. Vendor name and address
    j. Warranty period
    k. Inventory tag number (all fixed assets should be tagged with a unique identifying number)
    l. Number of the Yellowstone Partners check used to pay for the equipment

3. At least annually, a physical inspection and inventory should be taken of all Yellowstone Partners fixed assets and reconciled to the general ledger balances. Adjustments for dispositions should be made.

4. The Fiscal Manager should be informed, in writing, via an interoffice memorandum of any material changes in the status of property and equipment. This should include changes in location, sale of, scrapping of and/or obsolescence of items and any purchase or sale of real estate.

5. All capital items which have a cost greater than $250.00 will be capitalized and depreciated.

# Payroll

## *Personnel:*

1.  The Fiscal Manager is charged with the responsibility of maintaining personnel files on staff persons.
2.  Each personnel file should contain the following information, at a minimum.
    a.  Employment application or resume
    b.  A record of background investigation
    c.  Date of employment
    d.  Position, pay rates and changes therein
    e.  Authorization of payroll deductions
    f.  Earnings records for non-active employees
    g.  W-4 Form, withholding authorization
    h.  I-9 Immigration Form
    I.  Termination data, when applicable
3.  All personnel records are to be kept locked in a locking file cabinet in the Fiscal Manager's office. Access to these files other than by the Fiscal Manager, President, Vice President or the auditor should be requested in writing to the President.

## *Payroll Preparation and Timekeeping:*

1.  Timesheets are to be prepared by all staff persons and submitted semi-monthly on the 15th and last day of each month. Time should be input on a daily basis and, if in writing, completed in ink. Correction fluid should never be used in preparing timesheets. If an error needs to be corrected, a line should be drawn through the item and the corrected information recorded, and initialed by the person who made the correction.
2.  Timesheets are to include specific time spent on each grant/project.
3.  Timesheets are to be signed by the staff person and his/her supervisor.
4.  All approved timesheets should be submitted to the Fiscal Manager, who will verify the hours worked against his/her record.
5.  The Fiscal Manager should then process the time and report the information to the payroll service bureau. The information reported should include:
    a.  Hours worked, by cost center
    b.  Changes in pay rates or employment status

      c.    Vacation, sick or personal hours used and earned

6.    The President or Vice President should review the payroll summary page of the payroll service report for inappropriate payees or unusual hours.

7.    Paychecks should be distributed by the Fiscal Manager on the designated day and hour, one week after the end of the pay period according to a prearranged schedule distributed by the Fiscal Manager. In the event that a paycheck is picked up by a designated person other than the staff person, a memo should be received in writing from the staff person and proper identification should be requested from the party picking up the pay check.

8.    As an employee benefit, Yellowstone Partners offers direct deposit through the employee's own financial institution and also offers cost-free checking through [Bank Name]. Through direct deposit, payroll is deposited as cash into the employee's account on payday.

# Financial Reporting

## Monthly Reports:

The Fiscal Manager should prepare a set of monthly financial reports for distribution to the President, and the Budget and Finance Committee. The reports should include: a balance sheet and a statement of income and expenses for each department (operating, project); a consolidated balance sheet and consolidated income and expense report which show all departments combined; a budget-to-actual report for all accounts included in the annual operating budget; a list of deferred and receivable funds, and a cash flow projection. In addition, the monthly reports for the quarterly periods (December, March, June, and September) will be submitted to the full board for their review and acceptance at the following board meeting.

The monthly statements should be reviewed by the President or Vice President prior to distribution to the Treasurer for initial comments. After the Treasurer's approval, the statements will be mailed to the Budget and Finance Committee every month and to the full board as stated above. The monthly statements will be finalized by the conclusion of the month following the statement period.

## Year-End Report/Audit:

At fiscal year-end, and in time for the winter retreat of the Board of Directors, a year-end Audit report should be prepared summarizing the total income and expense activity for the year. A balance sheet should be prepared as of December 31 and should be attached to the income and expense report. This report will be initially reviewed by the President and Vice President, and then by the Treasurer, prior to distribution at the annual meeting.

Bids for an independent auditor to conduct this review will be accepted between November 15 and December 31. In accordance with Yellowstone Partners policy, at least three proposals will be considered. The auditing process will begin on or about February 1.

# Exhibit D

Blake S. Atkin (Idaho 6903)
ATKIN LAW OFFICES, PC
7579 N Westside Highway
Clifton, ID 83228
Office⊗801) 533-0300
blake@atkinlawoffices.net

Brennan H. Moss (Utah 10267) (Pro Hac Vice pending)
Pia Anderson Moss Hoyt, LLC
136 E. South Temple, Suite 1900
Salt Lake City, Utah 84111
Office: (801) 350-9000
Facsimile: (801) 350-9010
Email: bmoss@pamhlaw.com

*Attorneys for Defendant KayLynn Dalebout*

## UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO
### Eastern Division

| | |
|---|---|
| Yellowstone Partners, LLC,<br><br>                    Plaintiff,<br><br>v.<br><br>KayLynn Dalebout,<br><br>                    Defendant. | **DECLARATION OF<br>KAYLYNN DALEBOUT**<br><br>Case No. |

I, KayLynn Dalebout, under penalty of perjury and pursuant to 28 U.S.C. § 1746, do hereby submit this Declaration in Support of Notice of Removal, and declare the following to be true and correct:

1.      I am a resident of the State of Wyoming, am over the age of twenty-one, am competent in every respect to make this declaration, and make it based upon my personal knowledge.

2.      I am not a resident of the State of Idaho and I was not a resident of the State of Idaho at the time of the filing of the Verified Complaint by Yellowstone Partners LLC.

3.      I was served with the summons and Verified Complaint at my residence in the State of Wyoming.

I declare under criminal penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATED this 21st day of June 2019.

/s/ KayLynn Dalebout